# PUD NO. 1 OF JEFFERSON COUNTY ET AL. *v.* WASHINGTON DEPARTMENT OF ECOLOGY ET AL.

No. 92–1911.   Argued February 23, 1994—Decided May 31, 1994

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 723. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 724.

*Howard E. Shapiro* argued the cause for petitioners. With him on the briefs were *Michael A. Swiger, Gary D. Bachman, Albert R. Malanca,* and *Kenneth G. Kieffer.*

*Christine O. Gregoire,* Attorney General of Washington, argued the cause for respondents. With her on the briefs were *Jay J. Manning,* Senior Assistant Attorney General, and *William C. Frymire,* Assistant Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Schiffer, James A. Feldman,* and *Anne S. Almy.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Forest & Paper Association et al. by *John R. Molm, Winifred D. Simpson,* and *James A. Lamberth;* for Niagara Mohawk Power Corp. by *Edward Berlin, Kenneth G. Jaffe, Paul J. Kaleta, Brian K. Billinson,* and *Timothy P. Sheehan;* for the Northwest Hydroelectric Association by *Richard M. Glick* and *Lory J. Kraut;* for Pacific Northwest Utilities by *Sherilyn Peterson* and *R. Gerard Lutz;* and for the Western Urban Water Coalition by *Benjamin S. Sharp* and *Guy R. Martin.*

Briefs of *amici curiae* urging affirmance were filed for the State of Vermont et al. by *Jeffrey L. Amestoy,* Attorney General of Vermont, and *Ronald A. Shems,* Assistant Attorney General, *Robert Abrams,* Attorney

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioners, a city and a local utility district, want to build a hydroelectric project on the Dosewallips River in Washington State. We must decide whether respondent state environmental agency (hereinafter respondent) properly conditioned a permit for the project on the maintenance of specific minimum stream flows to protect salmon and steelhead runs.

General of New York, and *Kathleen Liston Morrison*, Assistant Attorney General, *Grant Woods*, Attorney General of Arizona, *Winston Bryant*, Attorney General of Arkansas, *Daniel E. Lungren*, Attorney General of California, *Richard Blumenthal*, Attorney General of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Robert A. Butterworth*, Attorney General of Florida, *Michael J. Bowers*, Attorney General of Georgia, *Robert A. Marks*, Attorney General of Hawaii, *Larry EchoHawk*, Attorney General of Idaho, *Roland A. Burris*, Attorney General of Illinois, *Pamela Fanning Carter*, Attorney General of Indiana, *Bonnie J. Campbell*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *Chris Gorman*, Attorney General of Kentucky, *Michael E. Carpenter*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Scott Harshbarger*, Attorney General of Massachusetts, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *Jeremiah W. Nixon*, Attorney General of Missouri, *Joseph P. Mazurek*, Attorney General of Montana, *Don Stenberg*, Attorney General of Nebraska, *Frankie Sue Del Papa*, Attorney General of Nevada, *Jeffrey R. Howard*, Attorney General of New Hampshire, *Fred DeVesa*, Acting Attorney General of New Jersey, *Tom Udall*, Attorney General of New Mexico, *Michael F. Easley*, Attorney General of North Carolina, *Heidi Heitkamp*, Attorney General of North Dakota, *Lee Fisher*, Attorney General of Ohio, *Susan B. Loving*, Attorney General of Oklahoma, *Theodore R. Kulongoski*, Attorney General of Oregon, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Jefferey B. Pine*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Charles W. Burson*, Attorney General of Tennessee, *Dan Morales*, Attorney General of Texas, *Jan Graham*, Attorney General of Utah, *Stephen D. Rosenthal*, Attorney General of Virginia, *Darrell V. McGraw, Jr.*, Attorney General of West Virginia, *James E. Doyle*, Attorney General of Wisconsin, *Joseph B. Meyer*, Attorney General of Wyoming, and *John Payton*, Corporation Counsel of the District of Columbia; and for American Rivers et al. by *Paul M. Smith*.

## I

This case involves the complex statutory and regulatory scheme that governs our Nation's waters, a scheme that implicates both federal and state administrative responsibilities. The Federal Water Pollution Control Act, commonly known as the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.*, is a comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). The Act also seeks to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." § 1251(a)(2).

To achieve these ambitious goals, the Clean Water Act establishes distinct roles for the Federal and State Governments. Under the Act, the Administrator of the Environmental Protection Agency (EPA) is required, among other things, to establish and enforce technology-based limitations on individual discharges into the country's navigable waters from point sources. See §§ 1311, 1314. Section 303 of the Act also requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals for all intrastate waters. §§ 1311(b)(1)(C), 1313. These state water quality standards provide "a supplementary basis . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 205, n. 12 (1976).

A state water quality standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U. S. C. § 1313(c)(2)(A). In setting standards, the State must comply with the following broad requirements:

> "Such standards shall be such as to protect the public health or welfare, enhance the quality of water and

serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational [and other purposes.]" *Ibid.*

See also § 1251(a)(2).

A 1987 amendment to the Clean Water Act makes clear that § 303 also contains an "antidegradation policy"—that is, a policy requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation. Specifically, the Act permits the revision of certain effluent limitations or water quality standards "only if such revision is subject to and consistent with the antidegradation policy established under this section." § 1313(d)(4)(B). Accordingly, EPA's regulations implementing the Act require that state water quality standards include "a statewide antidegradation policy" to ensure that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 CFR § 131.12 (1993). At a minimum, state water quality standards must satisfy these conditions. The Act also allows States to impose more stringent water quality controls. See 33 U. S. C. §§ 1311(b)(1)(C), 1370. See also 40 CFR § 131.4(a) (1993) ("As recognized by section 510 of the Clean Water Act[, 33 U. S. C. § 1370], States may develop water quality standards more stringent than required by this regulation").

The State of Washington has adopted comprehensive water quality standards intended to regulate all of the State's navigable waters. See Washington Administrative Code (WAC) 173–201–010 to 173–201–120 (1986). The State created an inventory of all the State's waters, and divided the waters into five classes. 173–201–045. Each individual fresh surface water of the State is placed into one of these classes. 173–201–080. The Dosewallips River is classified AA, extraordinary. 173–201–080(32). The water quality

standard for Class AA waters is set forth at 173–201–045(1). The standard identifies the designated uses of Class AA waters as well as the criteria applicable to such waters.[1]

---

[1] WAC 173–201–045(1) (1986) provides in pertinent part:

"(1) Class AA (extraordinary).

"(a) General characteristic. Water quality of this class shall markedly and uniformly exceed the requirements for all or substantially all uses.

"(b) Characteristic uses. Characteristic uses shall include, but not be limited to, the following:

"(i) Water supply (domestic, industrial, agricultural).

"(ii) Stock watering.

"(iii) Fish and shellfish:

"Salmonid migration, rearing, spawning, and harvesting.

"Other fish migration, rearing, spawning, and harvesting.

.          .          .          .          .

"(iv) Wildlife habitat.

"(v) Recreation (primary contact recreation, sport fishing, boating, and aesthetic enjoyment).

"(vi) Commerce and navigation.

"(c) Water quality criteria

"(i) Fecal coliform organisms.

"(A) Freshwater—fecal coliform organisms shall not exceed a geometric mean value of 50 organisms/100 mL, with not more than 10 percent of samples exceeding 100 organisms/100 mL.

"(B) Marine water—fecal coliform organisms shall not exceed a geometric mean value of 14 organisms/100 mL, with not more than 10 percent of samples exceeding 43 organisms/100 mL.

"(ii) Dissolved oxygen [shall exceed specific amounts].

.          .          .          .          .

"(iii) Total dissolved gas shall not exceed 110 percent of saturation at any point of sample collection.

"(iv) Temperature shall not exceed [certain levels].

.          .          .          .          .

"(v) pH shall be within [a specified range].

"(vi) Turbidity shall not exceed [specific levels].

"(vii) Toxic, radioactive, or deleterious material concentrations shall be less than those which may affect public health, the natural aquatic environment, or the desirability of the water for any use.

"(viii) Aesthetic values shall not be impaired by the presence of materials or their effects, excluding those of natural origin, which offend the senses of sight, smell, touch, or taste."

In addition to these specific standards applicable to Class AA waters, the State has adopted a statewide antidegradation policy. That policy provides:

"(a) Existing beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses will be allowed.

"(b) No degradation will be allowed of waters lying in national parks, national recreation areas, national wildlife refuges, national scenic rivers, and other areas of national ecological importance.

. . . . .

"(f) In no case, will any degradation of water quality be allowed if this degradation interferes with or becomes injurious to existing water uses and causes long-term and irreparable harm to the environment." 173–201–035(8).

As required by the Act, EPA reviewed and approved the State's water quality standards. See 33 U. S. C. § 1313(c)(3); 42 Fed. Reg. 56792 (1977). Upon approval by EPA, the state standard became "the water quality standard for the applicable waters of that State." 33 U. S. C. § 1313(c)(3).

States are responsible for enforcing water quality standards on intrastate waters. § 1319(a). In addition to these primary enforcement responsibilities, § 401 of the Act requires States to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters. 33 U. S. C. § 1341. Specifically, § 401 requires an applicant for a federal license or permit to conduct any activity "which may result in any discharge into the navigable waters" to obtain from the State a certification "that any such discharge will comply with the applicable provisions of sections [1311, 1312, 1313, 1316, and 1317 of this title]." 33 U. S. C. § 1341(a). Section 401(d) further provides that "[a]ny certi-

fication . . . shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant . . . will comply with any applicable effluent limitations and other limitations, under section [1311 or 1312 of this title] . . . and with any other appropriate requirement of State law set forth in such certification." 33 U. S. C. § 1341(d). The limitations included in the certification become a condition on any federal license. *Ibid.*[2]

## II

Petitioners propose to build the Elkhorn Hydroelectric Project on the Dosewallips River. If constructed as presently planned, the facility would be located just outside the Olympic National Park on federally owned land within the Olympic National Forest. The project would divert water from a 1.2-mile reach of the river (the bypass reach), run the

---

[2] Section 401, as set forth in 33 U. S. C. § 1341, provides in relevant part:

"(a) Compliance with applicable requirements; application; procedures; license suspension

"(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State . . . that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.

.       .       .       .       .

"(d) Limitations and monitoring requirements of certification

"Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section."

water through turbines to generate electricity and then return the water to the river below the bypass reach. Under the Federal Power Act (FPA), 41 Stat. 1063, as amended, 16 U. S. C. § 791a *et seq.*, the Federal Energy Regulatory Commission (FERC) has authority to license new hydroelectric facilities. As a result, petitioners must get a FERC license to build or operate the Elkhorn Project. Because a federal license is required, and because the project may result in discharges into the Dosewallips River, petitioners are also required to obtain state certification of the project pursuant to § 401 of the Clean Water Act, 33 U. S. C. § 1341.

The water flow in the bypass reach, which is currently undiminished by appropriation, ranges seasonally between 149 and 738 cubic feet per second (cfs). The Dosewallips supports two species of salmon, coho and chinook, as well as steelhead trout. As originally proposed, the project was to include a diversion dam which would completely block the river and channel approximately 75% of the river's water into a tunnel alongside the streambed. About 25% of the water would remain in the bypass reach, but would be returned to the original riverbed through sluice gates or a fish ladder. Depending on the season, this would leave a residual minimum flow of between 65 and 155 cfs in the river. Respondent undertook a study to determine the minimum stream flows necessary to protect the salmon and steelhead fishery in the bypass reach. On June 11, 1986, respondent issued a § 401 water quality certification imposing a variety of conditions on the project, including a minimum stream flow requirement of between 100 and 200 cfs depending on the season.

A state administrative appeals board determined that the minimum flow requirement was intended to enhance, not merely maintain, the fishery, and that the certification condition therefore exceeded respondent's authority under state law. App. to Pet. for Cert. 55a–57a. On appeal, the

State Superior Court concluded that respondent could require compliance with the minimum flow conditions. *Id.*, at 29a–45a. The Superior Court also found that respondent had imposed the minimum flow requirement to protect and preserve the fishery, not to improve it, and that this requirement was authorized by state law. *Id.*, at 34a.

The Washington Supreme Court held that the antidegradation provisions of the State's water quality standards require the imposition of minimum stream flows. 121 Wash. 2d 179, 186–187, 849 P. 2d 646, 650 (1993). The court also found that § 401(d), which allows States to impose conditions based upon several enumerated sections of the Clean Water Act and "any other appropriate requirement of State law," 33 U. S. C. § 1341(d), authorized the stream flow condition. Relying on this language and the broad purposes of the Clean Water Act, the court concluded that § 401(d) confers on States power to "consider all state action related to water quality in imposing conditions on section 401 certificates." 121 Wash. 2d, at 192, 849 P. 2d, at 652. We granted certiorari, 510 U. S. 810 (1993), to resolve a conflict among the state courts of last resort. See 121 Wash. 2d 179, 849 P. 2d 646 (1993); *Georgia Pacific Corp.* v. *Dept. of Environmental Conservation,* 159 Vt. 639, 628 A. 2d 944 (1992) (table); *Power Authority of New York* v. *Williams,* 60 N. Y. 2d 315, 457 N. E. 2d 726 (1983). We now affirm.

### III

The principal dispute in this case concerns whether the minimum stream flow requirement that the State imposed on the Elkhorn Project is a permissible condition of a § 401 certification under the Clean Water Act. To resolve this dispute we must first determine the scope of the State's authority under § 401. We must then determine whether the limitation at issue here, the requirement that petitioners maintain minimum stream flows, falls within the scope of that authority.

## A

There is no dispute that petitioners were required to obtain a certification from the State pursuant to § 401. Petitioners concede that, at a minimum, the project will result in two possible discharges—the release of dredged and fill material during the construction of the project, and the discharge of water at the end of the tailrace after the water has been used to generate electricity. Brief for Petitioners 27–28. Petitioners contend, however, that the minimum stream flow requirement imposed by the State was unrelated to these specific discharges, and that as a consequence, the State lacked the authority under § 401 to condition its certification on maintenance of stream flows sufficient to protect the Dosewallips fishery.

If § 401 consisted solely of subsection (a), which refers to a state certification that a "discharge" will comply with certain provisions of the Act, petitioners' assessment of the scope of the State's certification authority would have considerable force. Section 401, however, also contains subsection (d), which expands the State's authority to impose conditions on the certification of a project. Section 401(d) provides that any certification shall set forth "any effluent limitations and other limitations . . . necessary to assure that *any applicant*" will comply with various provisions of the Act and appropriate state law requirements. 33 U. S. C. § 1341(d) (emphasis added). The language of this subsection contradicts petitioners' claim that the State may only impose water quality limitations specifically tied to a "discharge." The text refers to the compliance of the applicant, not the discharge. Section 401(d) thus allows the State to impose "other limitations" on the project in general to assure compliance with various provisions of the Clean Water Act and with "any other appropriate requirement of State law." Although the dissent asserts that this interpretation of § 401(d) renders § 401(a)(1) superfluous, *post*, at 726, we see no such anomaly. Section 401(a)(1) identifies the category of activities

subject to certification—namely, those with discharges. And §401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied.

Our view of the statute is consistent with EPA's regulations implementing §401. The regulations expressly interpret §401 as requiring the State to find that "there is a reasonable assurance that the *activity* will be conducted in a manner which will not violate applicable water quality standards." 40 CFR §121.2(a)(3) (1993) (emphasis added). See also EPA, Wetlands and 401 Certification 23 (Apr. 1989) ("In 401(d), the Congress has given the States the authority to place any conditions on a water quality certification that are necessary to assure that the applicant will comply with effluent limitations, water quality standards, . . . and with 'any other appropriate requirement of State law'"). EPA's conclusion that *activities*—not merely discharges—must comply with state water quality standards is a reasonable interpretation of §401, and is entitled to deference. See, *e. g.*, *Arkansas* v. *Oklahoma*, 503 U. S. 91, 110 (1992); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

Although §401(d) authorizes the State to place restrictions on the activity as a whole, that authority is not unbounded. The State can only ensure that the project complies with "any applicable effluent limitations and other limitations, under [33 U. S. C. §§1311, 1312]" or certain other provisions of the Act, "and with any other appropriate requirement of State law." 33 U. S. C. §1341(d). The State asserts that the minimum stream flow requirement was imposed to ensure compliance with the state water quality standards adopted pursuant to §303 of the Clean Water Act, 33 U. S. C. §1313.

We agree with the State that ensuring compliance with §303 is a proper function of the §401 certification. Although §303 is not one of the statutory provisions listed in §401(d),

the statute allows States to impose limitations to ensure compliance with § 301 of the Act, 33 U. S. C. § 1311. Section 301 in turn incorporates § 303 by reference. See 33 U. S. C. § 1311(b)(1)(C); see also H. R. Conf. Rep. No. 95–830, p. 96 (1977) ("Section 303 is always included by reference where section 301 is listed"). As a consequence, state water quality standards adopted pursuant to § 303 are among the "other limitations" with which a State may ensure compliance through the § 401 certification process. This interpretation is consistent with EPA's view of the statute. See 40 CFR § 121.2(a)(3) (1992); EPA, Wetlands and 401 Certification, *supra*. Moreover, limitations to assure compliance with state water quality standards are also permitted by § 401(d)'s reference to "any other appropriate requirement of State law." We do not speculate on what additional state laws, if any, might be incorporated by this language.[3] But at a minimum, limitations imposed pursuant to state water quality standards adopted pursuant to § 303 are "appropriate" requirements of state law. Indeed, petitioners appear to agree that the State's authority under § 401 includes limitations designed to ensure compliance with state water quality standards. Brief for Petitioners 9, 21.

## B

Having concluded that, pursuant to § 401, States may condition certification upon any limitations necessary to ensure

---

[3] The dissent asserts that § 301 is concerned solely with discharges, not broader water quality standards. *Post*, at 730, n. 2. Although § 301 does make certain discharges unlawful, see 33 U. S. C. § 1311(a), it also contains a broad enabling provision which requires States to take certain actions, to wit: "In order to carry out the objective of this chapter [viz. the chemical, physical, and biological integrity of the Nation's water] there shall be achieved . . . not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, . . . established pursuant to any State law or regulations . . . ." 33 U. S. C. § 1311(b)(1)(C). This provision of § 301 expressly refers to state water quality standards, and is not limited to discharges.

compliance with state water quality standards or any other "appropriate requirement of State law," we consider whether the minimum flow condition is such a limitation. Under § 303, state water quality standards must "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U. S. C. § 1313(c)(2)(A). In imposing the minimum stream flow requirement, the State determined that construction and operation of the project as planned would be inconsistent with one of the designated uses of Class AA water, namely "[s]almonid [and other fish] migration, rearing, spawning, and harvesting." App. to Pet. for Cert. 83a–84a. The designated use of the river as a fish habitat directly reflects the Clean Water Act's goal of maintaining the "chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. § 1251(a). Indeed, the Act defines pollution as "the man-made or man induced alteration of the chemical, physical, biological, and radiological integrity of water." § 1362(19). Moreover, the Act expressly requires that, in adopting water quality standards, the State must take into consideration the use of waters for "propagation of fish and wildlife." § 1313(c)(2)(A).

Petitioners assert, however, that § 303 requires the State to protect designated uses solely through implementation of specific "criteria." According to petitioners, the State may not require them to operate their dam in a manner consistent with a designated "use"; instead, say petitioners, under § 303 the State may only require that the project comply with specific numerical "criteria."

We disagree with petitioners' interpretation of the language of § 303(c)(2)(A). Under the statute, a water quality standard must "consist of the designated uses of the navigable waters involved *and* the water quality criteria for such waters based upon such uses." 33 U. S. C. § 1313(c)(2)(A) (emphasis added). The text makes it plain that water quality standards contain two components. We think the lan-

guage of § 303 is most naturally read to require that a project be consistent with *both* components, namely, the designated use *and* the water quality criteria. Accordingly, under the literal terms of the statute, a project that does not comply with a designated use of the water does not comply with the applicable water quality standards.

Consequently, pursuant to § 401(d) the State may require that a permit applicant comply with both the designated uses and the water quality criteria of the state standards. In granting certification pursuant to § 401(d), the State "shall set forth any . . . limitations . . . necessary to assure that [the applicant] will comply with any . . . limitations under [§ 303] . . . and with any other appropriate requirement of State law." A certification requirement that an applicant operate the project consistently with state water quality standards— *i. e.*, consistently with the designated uses of the water body and the water quality criteria—is both a "limitation" to assure "compl[iance] with . . . limitations" imposed under § 303, and an "appropriate" requirement of state law.

EPA has not interpreted § 303 to require the States to protect designated uses exclusively through enforcement of numerical criteria. In its regulations governing state water quality standards, EPA defines criteria as "*elements* of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 CFR § 131.3(b) (1993) (emphasis added). The regulations further provide that "[w]hen criteria are met, water quality will *generally* protect the designated use." *Ibid.* (emphasis added). Thus, the EPA regulations implicitly recognize that in some circumstances, criteria alone are insufficient to protect a designated use.

Petitioners also appear to argue that use requirements are too open ended, and that the Act only contemplates enforcement of the more specific and objective "criteria." But this argument is belied by the open-ended nature of the criteria

themselves. As the Solicitor General points out, even "criteria" are often expressed in broad, narrative terms, such as "'there shall be no discharge of toxic pollutants in toxic amounts.'" Brief for United States as *Amicus Curiae* 18. See *American Paper Institute, Inc.* v. *EPA,* 996 F. 2d 346, 349 (CADC 1993). In fact, under the Clean Water Act, only one class of criteria, those governing "toxic pollutants listed pursuant to section 1317(a)(1)," need be rendered in numerical form. See 33 U. S. C. § 1313(c)(2)(B); 40 CFR § 131.11(b)(2) (1993).

Washington's Class AA water quality standards are typical in that they contain several open-ended criteria which, like the use designation of the river as a fishery, must be translated into specific limitations for individual projects. For example, the standards state that "[t]oxic, radioactive, or deleterious material concentrations shall be less than those which may affect public health, the natural aquatic environment, or the desirability of the water for any use." WAC 173–201–045(1)(c)(vii) (1986). Similarly, the state standards specify that "[a]esthetic values shall not be impaired by the presence of materials or their effects, excluding those of natural origin, which offend the senses of sight, smell, touch, or taste." 173–201–045(1)(c)(viii). We think petitioners' attempt to distinguish between uses and criteria loses much of its force in light of the fact that the Act permits enforcement of broad, narrative criteria based on, for example, "aesthetics."

Petitioners further argue that enforcement of water quality standards through use designations renders the water quality criteria component of the standards irrelevant. We see no anomaly, however, in the State's reliance on both use designations and criteria to protect water quality. The specific numerical limitations embodied in the criteria are a convenient enforcement mechanism for identifying minimum water conditions which will generally achieve the requisite water quality. And, in most circumstances, satisfying the criteria will, as EPA recognizes, be sufficient to maintain the

designated use. See 40 CFR § 131.3(b) (1993). Water quality standards, however, apply to an entire class of water, a class which contains numerous individual water bodies. For example, in the State of Washington, the Class AA water quality standard applies to 81 specified fresh surface waters, as well as to all "surface waters lying within the mountainous regions of the state assigned to national parks, national forests, and/or wilderness areas," all "lakes and their feeder streams within the state," and all "unclassified surface waters that are tributaries to Class AA waters." WAC 173–201–070 (1986). While enforcement of criteria will in general protect the uses of these diverse waters, a complementary requirement that activities also comport with designated uses enables the States to ensure that each activity—even if not foreseen by the criteria—will be consistent with the specific uses and attributes of a particular body of water.

Under petitioners' interpretation of the statute, however, if a particular criterion, such as turbidity, were missing from the list contained in an individual state water quality standard, or even if an existing turbidity criterion were insufficient to protect a particular species of fish in a particular river, the State would nonetheless be forced to allow activities inconsistent with the existing or designated uses. We think petitioners' reading leads to an unreasonable interpretation of the Act. The criteria components of state water quality standards attempt to identify, for all the water bodies in a given class, water quality requirements generally sufficient to protect designated uses. These criteria, however, cannot reasonably be expected to anticipate all the water quality issues arising from every activity that can affect the State's hundreds of individual water bodies. Requiring the States to enforce only the criteria component of their water quality standards would in essence require the States to study to a level of great specificity each individual surface water to ensure that the criteria applicable to that water are sufficiently detailed and individualized to fully protect the

water's designated uses. Given that there is no textual support for imposing this requirement, we are loath to attribute to Congress an intent to impose this heavy regulatory burden on the States.

The State also justified its minimum stream flow as necessary to implement the "antidegradation policy" of § 303, 33 U. S. C. § 1313(d)(4)(B). When the Clean Water Act was enacted in 1972, the water quality standards of all 50 States had antidegradation provisions. These provisions were required by federal law. See U. S. Dept. of Interior, Federal Water Pollution Control Administration, Compendium of Department of Interior Statements on Non-degradation of Interstate Waters 1–2 (Aug. 1968); see also Hines, A Decade of Nondegradation Policy in Congress and the Courts: The Erratic Pursuit of Clean Air and Clean Water, 62 Iowa L. Rev. 643, 658–660 (1977). By providing in 1972 that existing state water quality standards would remain in force until revised, the Clean Water Act ensured that the States would continue their antidegradation programs. See 33 U. S. C. § 1313(a). EPA has consistently required that revised state standards incorporate an antidegradation policy. And, in 1987, Congress explicitly recognized the existence of an "antidegradation policy established under [§ 303]." § 1313(d)(4)(B).

EPA has promulgated regulations implementing § 303's antidegradation policy, a phrase that is not defined elsewhere in the Act. These regulations require States to "develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy." 40 CFR § 131.12 (1993). These "implementation methods shall, at a minimum, be consistent with the . . . [e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Ibid.* EPA has explained that under its antidegradation regulation, "no activity is allowable . . . which could partially or completely eliminate any existing use." EPA, Questions and

Answers on Antidegradation 3 (Aug. 1985). Thus, States must implement their antidegradation policy in a manner "consistent" with existing uses of the stream. The State of Washington's antidegradation policy in turn provides that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses will be allowed." WAC 173–201–035(8)(a) (1986). The State concluded that the reduced stream flows would have just the effect prohibited by this policy. The Solicitor General, representing EPA, asserts, Brief for United States as *Amicus Curiae* 18–21, and we agree, that the State's minimum stream flow condition is a proper application of the state and federal antidegradation regulations, as it ensures that an "[e]xisting instream water us[e]" will be "maintained and protected." 40 CFR § 131.12(a)(1) (1993).

Petitioners also assert more generally that the Clean Water Act is only concerned with water "quality," and does not allow the regulation of water "quantity." This is an artificial distinction. In many cases, water quantity is closely related to water quality; a sufficient lowering of the water quantity in a body of water could destroy all of its designated uses, be it for drinking water, recreation, navigation or, as here, as a fishery. In any event, there is recognition in the Clean Water Act itself that reduced stream flow, *i. e.*, diminishment of water quantity, can constitute water pollution. First, the Act's definition of pollution as "the man-made or man induced alteration of the chemical, physical, biological, and radiological integrity of water" encompasses the effects of reduced water quantity. 33 U. S. C. § 1362(19). This broad conception of pollution—one which expressly evinces Congress' concern with the physical and biological integrity of water—refutes petitioners' assertion that the Act draws a sharp distinction between the regulation of water "quantity" and water "quality." Moreover, § 304 of the Act expressly recognizes that water "pollution" may result from "changes

in the movement, flow, or circulation of any navigable waters . . . , including changes caused by the construction of dams." 33 U. S. C. § 1314(f). This concern with the flowage effects of dams and other diversions is also embodied in the EPA regulations, which expressly require existing dams to be operated to attain designated uses. 40 CFR § 131.10(g)(4) (1992).

Petitioners assert that two other provisions of the Clean Water Act, §§ 101(g) and 510(2), 33 U. S. C. §§ 1251(g) and 1370(2), exclude the regulation of water quantity from the coverage of the Act. Section 101(g) provides "that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter." 33 U. S. C. § 1251(g). Similarly, § 510(2) provides that nothing in the Act shall "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters . . . of such States." 33 U. S. C. § 1370. In petitioners' view, these provisions exclude "water quantity issues from direct regulation under the federally controlled water quality standards authorized in § 303." Brief for Petitioners 39 (emphasis deleted).

This language gives the States authority to allocate water rights; we therefore find it peculiar that petitioners argue that it prevents the State from regulating stream flow. In any event, we read these provisions more narrowly than petitioners. Sections 101(g) and 510(2) preserve the authority of each State to allocate water quantity as between users; they do not limit the scope of water pollution controls that may be imposed on users who have obtained, pursuant to state law, a water allocation. In *California* v. *FERC*, 495 U. S. 490, 498 (1990), construing an analogous provision of the Federal Power Act,[4] we explained that "minimum stream

---

[4] The relevant text of the Federal Power Act provides: "That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to

flow requirements neither reflect nor establish 'proprietary rights'" to water. Cf. *First Iowa Hydro-Electric Cooperative* v. *FPC*, 328 U. S. 152, 176, and n. 20 (1946). Moreover, the certification itself does not purport to determine petitioners' proprietary right to the water of the Dosewallips. In fact, the certification expressly states that a "State Water Right Permit (Chapters 90.03.250 RCW and 508–12 WAC) must be obtained prior to commencing construction of the project." App. to Pet. for Cert. 83a. The certification merely determines the nature of the use to which that proprietary right may be put under the Clean Water Act, if and when it is obtained from the State. Our view is reinforced by the legislative history of the 1977 amendment to the Clean Water Act adding § 101(g). See 3 Legislative History of the Clean Water Act of 1977 (Committee Print compiled for the Committee on Environment and Public Works by the Library of Congress), Ser. No. 95–14, p. 532 (1978) ("The requirements [of the Act] may incidentally affect individual water rights. . . . It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations").

## IV

Petitioners contend that we should limit the State's authority to impose minimum flow requirements because FERC has comprehensive authority to license hydroelectric projects pursuant to the FPA, 16 U. S. C. § 791a *et seq.* In petitioners' view, the minimum flow requirement imposed here interferes with FERC's authority under the FPA.

the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." 41 Stat. 1077, 16 U. S. C. § 821.

The FPA empowers FERC to issue licenses for projects "necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams . . . over which Congress has jurisdiction." § 797(e). The FPA also requires FERC to consider a project's effect on fish and wildlife. §§ 797(e), 803(a)(1). In *California* v. *FERC, supra,* we held that the California Water Resources Control Board, acting pursuant to state law, could not impose a minimum stream flow which conflicted with minimum stream flows contained in a FERC license. We concluded that the FPA did not "save" to the States this authority. *Id.,* at 498.

No such conflict with any FERC licensing activity is presented here. FERC has not yet acted on petitioners' license application, and it is possible that FERC will eventually deny petitioners' application altogether. Alternatively, it is quite possible, given that FERC is required to give equal consideration to the protection of fish habitat when deciding whether to issue a license, that any FERC license would contain the same conditions as the state § 401 certification. Indeed, at oral argument the Deputy Solicitor General stated that both EPA and FERC were represented in this proceeding, and that the Government has no objection to the stream flow condition contained in the § 401 certification. Tr. of Oral Arg. 43–44.

Finally, the requirement for a state certification applies not only to applications for licenses from FERC, but to all federal licenses and permits for activities which may result in a discharge into the Nation's navigable waters. For example, a permit from the Army Corps of Engineers is required for the installation of any structure in the navigable waters which may interfere with navigation, including piers, docks, and ramps. Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1151, § 10, 33 U. S. C. § 403. Similarly, a permit must be obtained from the Army Corps of Engineers

for the discharge of dredged or fill material, and from the Secretary of the Interior or Agriculture for the construction of reservoirs, canals, and other water storage systems on federal land. See 33 U. S. C. §§ 1344(a), (e); 43 U. S. C. § 1761 (1988 ed. and Supp. IV). We assume that a § 401 certification would also be required for some licenses obtained pursuant to these statutes. Because § 401's certification requirement applies to other statutes and regulatory schemes, and because any conflict with FERC's authority under the FPA is hypothetical, we are unwilling to read implied limitations into § 401. If FERC issues a license containing a stream flow condition with which petitioners disagree, they may pursue judicial remedies at that time. Cf. *Escondido Mut. Water Co.* v. *La Jolla Band of Mission Indians*, 466 U. S. 765, 778, n. 20 (1984).

In summary, we hold that the State may include minimum stream flow requirements in a certification issued pursuant to § 401 of the Clean Water Act insofar as necessary to enforce a designated use contained in a state water quality standard. The judgment of the Supreme Court of Washington, accordingly, is affirmed.

*So ordered.*

JUSTICE STEVENS, concurring.

While I agree fully with the thorough analysis in the Court's opinion, I add this comment for emphasis. For judges who find it unnecessary to go behind the statutory text to discern the intent of Congress, this is (or should be) an easy case. Not a single sentence, phrase, or word in the Clean Water Act purports to place any constraint on a State's power to regulate the quality of its own waters more stringently than federal law might require. In fact, the Act explicitly recognizes States' ability to impose stricter standards. See, *e. g.*, § 301(b)(1)(C), 33 U. S. C. § 1311(b)(1)(C).

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

The Court today holds that a State, pursuant to § 401 of the Clean Water Act, may condition the certification necessary to obtain a federal license for a proposed hydroelectric project upon the maintenance of a minimum flow rate in the river to be utilized by the project. In my view, the Court makes three fundamental errors. First, it adopts an interpretation that fails adequately to harmonize the subsections of § 401. Second, it places no meaningful limitation on a State's authority under § 401 to impose conditions on certification. Third, it gives little or no consideration to the fact that its interpretation of § 401 will significantly disrupt the carefully crafted federal-state balance embodied in the Federal Power Act. Accordingly, I dissent.

I

A

Section 401(a)(1) of the Federal Water Pollution Control Act, otherwise known as the Clean Water Act (CWA or Act), 33 U. S. C. § 1251 *et seq.*, provides that "[a]ny applicant for a Federal license or permit to conduct any activity . . . , which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates . . . that any such discharge will comply with . . . applicable provisions of [the CWA]." 33 U. S. C. § 1341(a)(1). The terms of § 401(a)(1) make clear that the purpose of the certification process is to ensure that discharges from a project will meet the requirements of the CWA. Indeed, a State's authority under § 401(a)(1) is limited to certifying that "any discharge" that "may result" from "any activity," such as petitioners' proposed hydroelectric project, will "comply" with the enumerated provisions of the CWA; if the discharge will fail to comply, the State may "den[y]" the certification. *Ibid.* In addition, under § 401(d), a State may place conditions on a

§ 401 certification, including "effluent limitations and other limitations, and monitoring requirements," that may be necessary to ensure compliance with various provisions of the CWA and with "any other appropriate requirement of State law." § 1341(d).

The minimum stream flow condition imposed by respondents in this case has no relation to any possible "discharge" that might "result" from petitioners' proposed project. The term "discharge" is not defined in the CWA, but its plain and ordinary meaning suggests "a flowing or issuing out," or "something that is emitted." Webster's Ninth New Collegiate Dictionary 360 (1991). Cf. 33 U. S. C. § 1362(16) ("The term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants"). A minimum stream flow requirement, by contrast, is a limitation on the amount of water the project can take in or divert from the river. See *ante*, at 709. That is, a minimum stream flow requirement is a limitation on intake—the opposite of discharge. Imposition of such a requirement would thus appear to be beyond a State's authority as it is defined by § 401(a)(1).

The Court remarks that this reading of § 401(a)(1) would have "considerable force," *ante*, at 711, were it not for what the Court understands to be the expansive terms of § 401(d). That subsection, as set forth in 33 U. S. C. § 1341(d), provides:

> "Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that *any applicant* for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Fed-

eral license or permit subject to the provisions of this section." (Emphasis added.)

According to the Court, the fact that § 401(d) refers to an "applicant," rather than a "discharge," complying with various provisions of the Act "contradicts petitioners' claim that the State may only impose water quality limitations specifically tied to a 'discharge.'" *Ante,* at 711. In the Court's view, § 401(d)'s reference to an applicant's compliance "expands" a State's authority beyond the limits set out in § 401(a)(1), *ibid.,* thereby permitting the State in its certification process to scrutinize the applicant's proposed "activity as a whole," not just the discharges that may result from the activity, *ante,* at 712. The Court concludes that this broader authority allows a State to impose conditions on a § 401 certification that are unrelated to discharges. *Ante,* at 711–712.

While the Court's interpretation seems plausible at first glance, it ultimately must fail. If, as the Court asserts, § 401(d) permits States to impose conditions unrelated to discharges in § 401 certifications, Congress' careful focus on discharges in § 401(a)(1)—the provision that describes the scope and function of the certification process—was wasted effort. The power to set conditions that are unrelated to discharges is, of course, nothing but a conditional power to deny certification for reasons unrelated to discharges. Permitting States to impose conditions unrelated to discharges, then, effectively eliminates the constraints of § 401(a)(1).

Subsections 401(a)(1) and (d) can easily be reconciled to avoid this problem. To ascertain the nature of the conditions permissible under § 401(d), § 401 must be read as a whole. See *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 371 (1988) (statutory interpretation is a "holistic endeavor"). As noted above, § 401(a)(1) limits a State's authority in the certification process to addressing concerns related to discharges and to ensuring that any discharge resulting from a project will comply with specified provisions of the Act. It is reasonable

to infer that the conditions a State is permitted to impose on certification must relate to the very purpose the certification process is designed to serve. Thus, while § 401(d) permits a State to place conditions on a certification to ensure compliance of the "applicant," those conditions must still be related to discharges. In my view, this interpretation best harmonizes the subsections of § 401. Indeed, any broader interpretation of § 401(d) would permit that subsection to swallow § 401(a)(1).

The text of § 401(d) similarly suggests that the conditions it authorizes must be related to discharges. The Court attaches critical weight to the fact that § 401(d) speaks of the compliance of an "applicant," but that reference, in and of itself, says little about the nature of the conditions that may be imposed under § 401(d). Rather, because § 401(d) conditions can be imposed only to ensure compliance with specified provisions of law—that is, with "applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard[s] of performance under section 1316 of this title, . . . prohibition[s], effluent standard[s], or pretreatment standard[s] under section 1317 of this title, [or] . . . any other appropriate requirement[s] of State law"—one should logically turn to those provisions for guidance in determining the nature, scope, and purpose of § 401(d) conditions. Each of the four identified CWA provisions describes discharge-related limitations. See § 1311 (making it unlawful to discharge any pollutant except in compliance with enumerated provisions of the Act); § 1312 (establishing effluent limitations on point source discharges); § 1316 (setting national standards of performance for the control of discharges); and § 1317 (setting pretreatment effluent standards and prohibiting the discharge of certain effluents except in compliance with standards).

The final term on the list—"appropriate requirement[s] of State law"—appears to be more general in scope. Because

this reference follows a list of more limited provisions that specifically address discharges, however, the principle *ejusdem generis* would suggest that the general reference to "appropriate" requirements of state law is most reasonably construed to extend only to provisions that, like the other provisions in the list, impose discharge-related restrictions. Cf. *Cleveland* v. *United States*, 329 U. S. 14, 18 (1946) ("Under the *ejusdem generis* rule of construction the general words are confined to the class and may not be used to enlarge it"); *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 84 (1990). In sum, the text and structure of § 401 indicate that a State may impose under § 401(d) only those conditions that are related to discharges.

### B

The Court adopts its expansive reading of § 401(d) based at least in part upon deference to the "conclusion" of the Environmental Protection Agency (EPA) that § 401(d) is not limited to requirements relating to discharges. *Ante*, at 712. The agency regulation to which the Court defers is 40 CFR § 121.2(a)(3) (1993), which provides that the certification shall contain "[a] statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." *Ante*, at 712. According to the Court, "EPA's conclusion that *activities*—not merely discharges—must comply with state water quality standards . . . is entitled to deference" under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). *Ante*, at 712.

As a preliminary matter, the Court appears to resort to deference under *Chevron* without establishing through an initial examination of the statute that the text of the section is ambiguous. See *Chevron, supra*, at 842–843. More importantly, the Court invokes *Chevron* deference to support its interpretation even though the Government does not seek

deference for the EPA's regulation in this case.[1]  That the Government itself has not contended that an agency interpretation exists reconciling the scope of the conditioning authority under § 401(d) with the terms of § 401(a)(1) should suggest to the Court that there is no "agenc[y] construction" directly addressing the question.  *Chevron, supra,* at 842.

In fact, the regulation to which the Court defers is hardly a definitive construction of the scope of § 401(d).   On the contrary, the EPA's position on the question whether conditions under § 401(d) must be related to discharges is far from clear. Indeed, the only EPA regulation that specifically addresses the "conditions" that may appear in § 401 certifications speaks exclusively in terms of limiting discharges.   According to the EPA, a § 401 certification shall contain "[a] statement *of any conditions* which the certifying agency deems necessary or desirable *with respect to the discharge of the activity.*"   40 CFR § 121.2(a)(4) (1993) (emphases added). In my view, § 121.2(a)(4) should, at the very least, give the Court pause before it resorts to *Chevron* deference in this case.

## II

The Washington Supreme Court held that the State's water quality standards, promulgated pursuant to § 303 of the Act, 33 U. S. C. § 1313, were "appropriate" requirements of state law under § 401(d), and sustained the stream flow condition imposed by respondents as necessary to ensure compliance with a "use" of the river as specified in those standards.   As an alternative to their argument that § 401(d) conditions must be discharge related, petitioners assert that

---

[1] The Government, appearing as *amicus curiae* "supporting affirmance," instead approaches the question presented by assuming, *arguendo,* that petitioners' construction of § 401 is correct: "Even if a condition imposed under Section 401(d) were valid only if it assured that a 'discharge' will comply with the State's water quality standards, the [minimum flow condition set by respondents] satisfies that test."   Brief for United States as *Amicus Curiae* 11.

the state court erred when it sustained the stream flow condition under the "use" component of the State's water quality standards without reference to the corresponding "water quality criteria" contained in those standards. As explained above, petitioners' argument with regard to the scope of a State's authority to impose conditions under § 401(d) is correct. I also find petitioners' alternative argument persuasive. Not only does the Court err in rejecting that § 303 argument, in the process of doing so it essentially removes all limitations on a State's conditioning authority under § 401.

The Court states that, "at a minimum, limitations imposed pursuant to state water quality standards adopted pursuant to § 303 are 'appropriate' requirements of state law" under § 401(d). *Ante,* at 713.[2] A water quality standard promulgated pursuant to § 303 must "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U. S. C. § 1313(c)(2)(A). The Court asserts that this language "is most naturally read to require that a project be consistent with *both* components, namely, the designated use *and* the water quality criteria." *Ante,* at 715. In the Court's view, then, the "use" of a body of water is independently enforceable through § 401(d) without reference to the corresponding criteria. *Ibid.*

The Court's reading strikes me as contrary to common sense. It is difficult to see how compliance with a "use" of a body of water could be enforced without reference to the

---

[2] In the Court's view, § 303 water quality standards come into play under § 401(d) either as "appropriate" requirements of state law or through § 301 of the Act, which, according to the Court, "incorporates § 303 by reference." *Ante,* at 713 (citations omitted). The Court notes that through § 303, "the statute allows States to impose limitations to ensure compliance with § 301 of the Act." *Ibid.* Yet § 301 makes unlawful only "the [unauthorized] *discharge* of any pollutant by any person." 33 U. S. C. § 1311(a) (emphasis added); cf. *supra,* at 727. Thus, the Court's reliance on § 301 as a source of authority to impose conditions unrelated to discharges is misplaced.

corresponding criteria. In this case, for example, the applicable "use" is contained in the following regulation: "Characteristic uses shall include, but not be limited to, . . . [s]almonid migration, rearing, spawning, and harvesting." Wash. Admin. Code (WAC) 173–201–045(1)(b)(iii) (1986). The corresponding criteria, by contrast, include measurable factors such as quantities of fecal coliform organisms and dissolved gases in the water. 173–201–045(1)(c)(i) and (ii).[3] Although the Act does not further address (at least not expressly) the link between "uses" and "criteria," the regulations promulgated under § 303 make clear that a "use" is an aspirational goal to be attained through compliance with corresponding "criteria." Those regulations suggest that "uses" are to be "achieved and protected," and that "water quality criteria" are to be adopted to "protect the designated use[s]." 40 CFR §§ 131.10(a), 131.11(a)(1) (1993).

The problematic consequences of decoupling "uses" and "criteria" become clear once the Court's interpretation of § 303 is read in the context of § 401. In the Court's view, a State may condition the § 401 certification "upon *any limitations* necessary to ensure compliance" with the "uses of the water body." *Ante*, at 713–714, 715 (emphasis added). Under the Court's interpretation, then, state environmental agencies may pursue, through § 401, their water goals in any way they choose; the conditions imposed on certifications need not relate to discharges, nor to water quality criteria, nor to any objective or quantifiable standard, so long as they tend to make the water more suitable for the uses the State has chosen. In short, once a State is allowed to impose conditions on § 401 certifications to protect "uses" in the abstract, § 401(d) is limitless.

To illustrate, while respondents in this case focused only on the "use" of the Dosewallips River as a fish habitat, this particular river has a number of other "[c]haracteristic uses,"

---

[3] Respondents concede that petitioners' project "will likely not violate any of Washington's water quality criteria." Brief for Respondents 24.

including "[r]ecreation (primary contact recreation, sport fishing, boating, and aesthetic enjoyment)." WAC 173–201–045(1)(b)(v) (1986). Under the Court's interpretation, respondents could have imposed any number of conditions related to recreation, including conditions that have little relation to water quality. In *Town of Summersville*, 60 FERC ¶ 61,291, p. 61,990 (1992), for instance, the state agency required the applicant to "construct . . . access roads and paths, low water stepping stone bridges, . . . a boat launching facility . . . , and a residence and storage building." These conditions presumably would be sustained under the approach the Court adopts today.[4] In the end, it is difficult to conceive of a condition that would fall outside a State's § 401(d) authority under the Court's approach.

## III

The Court's interpretation of § 401 significantly disrupts the careful balance between state and federal interests that Congress struck in the Federal Power Act (FPA), 16 U. S. C. § 791 *et seq.* Section 4(e) of the FPA authorizes the Federal Energy Regulatory Commission (FERC) to issue licenses for projects "necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams . . . over which Congress has jurisdiction." 16 U. S. C. § 797(e). In the licensing process, FERC must balance a number of considerations: "[I]n addition to the power and development purposes for which licenses are issued, [FERC] shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of rec-

---

[4] Indeed, as the § 401 certification stated in this case, the flow levels imposed by respondents are "in excess of those required to maintain water quality in the bypass region," App. to Pet. for Cert. 83a, and therefore conditions not related to water quality must, in the Court's view, be permitted.

reational opportunities, and the preservation of other aspects of environmental quality." *Ibid.* Section 10(a) empowers FERC to impose on a license such conditions, including minimum stream flow requirements, as it deems best suited for power development and other public uses of the waters. See 16 U. S. C. § 803(a); *California* v. *FERC,* 495 U. S. 490, 494–495, 506 (1990).

In *California* v. *FERC,* the Court emphasized FERC's exclusive authority to set the stream flow levels to be maintained by federally licensed hydroelectric projects. California, in order "to protect [a] stream's fish," had imposed flow rates on a federally licensed project that were significantly higher than the flow rates established by FERC. *Id.,* at 493. In concluding that California lacked authority to impose such flow rates, we stated:

> "As Congress directed in FPA § 10(a), FERC set the conditions of the [project] license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development. Allowing California to impose significantly higher minimum stream flow requirements would disturb and conflict with the balance embodied in that considered federal agency determination. FERC has indicated that the California requirements interfere with its comprehensive planning authority, and we agree that allowing California to impose the challenged requirements would be contrary to congressional intent regarding the Commission's licensing authority and would constitute a veto of the project that was approved and licensed by FERC." *Id.,* at 506–507 (citations and internal quotation marks omitted).

*California* v. *FERC* reaffirmed our decision in *First Iowa Hydro-Electric Cooperative* v. *FPC,* 328 U. S. 152, 164 (1946), in which we warned against "vest[ing] in [state authorities]

a veto power" over federal hydroelectric projects. Such authority, we concluded, could "destroy the effectiveness" of the FPA and "subordinate to the control of the State the 'comprehensive' planning" with which the administering federal agency (at that time the Federal Power Commission) was charged. *Ibid.*

Today, the Court gives the States precisely the veto power over hydroelectric projects that we determined in *California* v. *FERC* and *First Iowa* they did not possess. As the language of § 401(d) expressly states, any condition placed in a § 401 certification, including, in the Court's view, a stream flow requirement, "*shall* become a condition on any Federal license or permit." 33 U. S. C. § 1341(d) (emphasis added). Any condition imposed by a State under § 401(d) thus becomes a "ter[m] . . . of the license as a matter of law," *Department of Interior* v. *FERC*, 952 F. 2d 538, 548 (CADC 1992) (citation and internal quotation marks omitted), regardless of whether FERC favors the limitation. Because of § 401(d)'s mandatory language, federal courts have uniformly held that FERC has no power to alter or review § 401 conditions, and that the proper forum for review of those conditions is state court.[5] Section 401(d) conditions imposed by States are

---

[5] See, *e. g., Keating* v. *FERC*, 927 F. 2d 616, 622 (CADC 1991) (federal review inappropriate because a decision to grant or deny § 401 certification "presumably turns on questions of substantive state environmental law—an area that Congress expressly intended to reserve to the states and concerning which federal agencies have little competence"); *Department of Interior* v. *FERC*, 952 F. 2d, at 548; *United States* v. *Marathon Development Corp.*, 867 F. 2d 96, 102 (CA1 1989); *Proffitt* v. *Rohm & Haas*, 850 F. 2d 1007, 1009 (CA3 1988). FERC has taken a similar position. See *Town of Summersville*, 60 FERC ¶ 61,291, p. 61,990 (1992) ("[S]ince pursuant to Section 401(d) . . . all of the conditions in the water quality certification must become conditions in the license, review of the appropriateness of the conditions is within the purview of state courts and not the Commission. The only alternatives available to the Commission are either to issue a license with the conditions included or to deny" the application altogether); accord, *Central Maine Power Co.*, 52 FERC ¶ 61,033, pp. 61,172–61,173 (1990).

therefore binding on FERC. Under the Court's interpretation, then, it appears that the mistake of the State in *California* v. *FERC* was not that it had trespassed into territory exclusively reserved to FERC; rather, it simply had not hit upon the proper device—that is, the § 401 certification—through which to achieve its objectives.

Although the Court notes in passing that "[t]he limitations included in the certification become a condition on any federal license," *ante*, at 708, it does not acknowledge or discuss the shift of power from FERC to the States that is accomplished by its decision. Indeed, the Court merely notes that "any conflict with FERC's authority under the FPA" in this case is "hypothetical" at this stage, *ante*, at 723, because "FERC has not yet acted on petitioners' license application," *ante*, at 722. We are assured that "it is quite possible . . . that any FERC license would contain the same conditions as the state § 401 certification." *Ibid.*

The Court's observations simply miss the point. Even if FERC might have no objection to the stream flow condition established by respondents *in this case*, such a happy coincidence will likely prove to be the exception, rather than the rule. In issuing licenses, FERC must balance the *Nation's* power needs together with the need for energy conservation, irrigation, flood control, fish and wildlife protection, and recreation. 16 U. S. C. § 797(e). State environmental agencies, by contrast, need only consider parochial environmental interests. Cf., *e. g.*, Wash. Rev. Code § 90.54.010(2) (1992) (goal of State's water policy is to "insure that waters of the state are protected and fully utilized for the greatest benefit to the people of the state of Washington"). As a result, it is likely that conflicts will arise between a FERC-established stream flow level and a state-imposed level.

Moreover, the Court ignores the fact that its decision nullifies the congressionally mandated process for resolving such state-federal disputes when they develop. Section 10(j)(1) of the FPA, 16 U. S. C. § 803(j)(1), which was added as part

of the Electric Consumers Protection Act of 1986 (ECPA), 100 Stat. 1244, provides that every FERC license must include conditions to "protect, mitigate damag[e] to, and enhance" fish and wildlife, including "related spawning grounds and habitat," and that such conditions "shall be based on recommendations" received from various agencies, including state fish and wildlife agencies. If FERC believes that a recommendation from a state agency is inconsistent with the FPA—that is, inconsistent with what FERC views as the proper balance between the Nation's power needs and environmental concerns—it must "attempt to resolve any such inconsistency, giving due weight to the recommendations, expertise, and statutory responsibilities" of the state agency. § 803(j)(2). If, after such an attempt, FERC "does not adopt in whole or in part a recommendation of any [state] agency," it must publish its reasons for rejecting that recommendation. *Ibid.* After today's decision, these procedures are a dead letter with regard to stream flow levels, because a State's "recommendation" concerning stream flow "shall" be included in the license when it is imposed as a condition under § 401(d).

More fundamentally, the 1986 amendments to the FPA simply make no sense in the stream flow context if, in fact, the States already possessed the authority to establish minimum stream flow levels under § 401(d) of the CWA, which was enacted years before those amendments. Through the ECPA, Congress strengthened the role of the States in establishing FERC conditions, but it did not make that authority paramount. Indeed, although Congress could have vested in the States the final authority to set stream flow conditions, it instead left that authority with FERC. See *California* v. *FERC*, 495 U. S., at 499. As the Ninth Circuit observed in the course of rejecting California's effort to give *California* v. *FERC* a narrow reading, "[t]here would be no point in Congress requiring [FERC] to consider the state agency recommendations on environmental matters and

make its own decisions about which to accept, if the state agencies had the power to impose the requirements themselves." *Sayles Hydro Associates* v. *Maughan*, 985 F. 2d 451, 456 (1993).

Given the connection between § 401 and federal hydroelectric licensing, it is remarkable that the Court does not at least attempt to fit its interpretation of § 401 into the larger statutory framework governing the licensing process. At the very least, the significant impact the Court's ruling is likely to have on that process should compel the Court to undertake a closer examination of § 401 to ensure that the result it reaches was mandated by Congress.

## IV

Because the Court today fundamentally alters the federal-state balance Congress carefully crafted in the FPA, and because such a result is neither mandated nor supported by the text of § 401, I respectfully dissent.