STATE OF VERMONT

SUPERIOR COURT
ENVIRONMENTAL DIVISION
Docket No. 103-9-16 Vtec

| | |
|---|---|
| Morrisville Hydroelectric Project Water Quality | Decision on Motions |

This is an appeal from a water quality certification issued by the Agency of Natural Resources to Morrisville Water and Light for the Morrisville Hydroelectric Project located on the Lamoille River and its tributaries in north-central Vermont. Morrisville Water and Light applied for the certification as part of a separate licensing application with the Federal Energy Regulatory Commission. The Agency of Natural Resources issued the certification, and Morrisville Water and Light subsequently filed an appeal in this Court challenging various aspects of the certification as issued. American Whitewater and the Vermont Paddlers' Club, the Vermont Natural Resources Council, and the Vermont Council of Trout Unlimited all filed cross-appeals.

The matter is now before the Court on multiple motions to dismiss and motions for summary judgment.

I.      **Motions under Review**

a. **AW/VPC Motion for Partial Summary Judgment**

On February 3, 2017, American Whitewater and the Vermont Paddlers' Club (AW/VPC) moved for summary judgment on its amended Question 1.

The Agency of Natural Resources (ANR) filed an opposition to the motion on March 6, 2017, and AW/VPC filed a response on March 21, 2017.[1] AW/VPC is represented by Daniel P. Richardson, Esq. and Ryan P. Kane, Esq. ANR is represented by Leslie A. Welts, Esq. and Jennifer S. Duggan, Esq.

---

[1] The response filed March 21, 2017 is missing a page. AW/VPC re-filed the response, including the missing page, on March 22, 2017.

For the reasons set out below, AW/VPC's motion for summary judgment on its amended Question 1 is **DENIED**.

### b. ANR Motion to Dismiss and Motion for Summary Judgment

On February 3, 2017, ANR moved to dismiss, pursuant to civil rule 12(b)(6), a portion of Morrisville Water and Light (MWL) amended Question 6, and AW/VPC Questions 1 and 14. ANR also moved for summary judgment on MWL Questions 1, 2, and 3.

MWL filed a motion for an extension for time to reply on February 9, 2017, and then filed an opposition to the motion to dismiss and motion for summary judgment on February 21, 2017. ANR filed a reply to this on March 8, 2017. AW/VPC filed an opposition to the motion to dismiss on March 8, 2017, and ANR filed a reply on March 22, 2017.

For the reasons set out below, ANR's motion to dismiss AW/VPC amended Question 1 is **DENIED**, and its motion to dismiss AW/VPC amended Question 14 is **GRANTED**. ANR's motion for summary judgment on part of MWL Question 3 is **GRANTED**, and ANR's motions to dismiss and for summary judgment on MWL Questions 1, 2, and 6 are **MOOT**.

### c. VNRC and VTTU Motion to Dismiss MWL Questions

On February 3, 2017, the Vermont Natural Resources Council (VNRC) and the Vermont Council of Trout Unlimited (VTTU) moved to dismiss Appellant Morrisville Water and Light's (MWL) amended Questions 1, 2, 3, 6, and 8 pursuant to civil rule 12(b)(6).

MWL filed an opposition to the motion on February 16, 2017. VNRC is represented by Jon Groveman, Esq.; VTTU is represented by Robert J. Carpenter, Esq.; and MWL is represented by Gregory M. Eaton, Esq. and Clara E. Conklin, Esq.

For the reasons set out below, VNRC AND VTTU's motion to dismiss MWL Questions 1, 2, 6, 8, and the portion of Question 3 not affected by ANR's motion for summary judgment is **GRANTED**.

### d. VNRC and VTTU Motion for Summary Judgment on AW/VPC Questions

On February 3, 2017, VNRC and VTTU moved for summary judgment on AW/VPC's amended Questions 3, 4, 5, 7, 8, 9, 11, and 12.

ANR filed a response in support of the motion on March 6, 2017. AW/VPC filed an opposition to the motion for summary judgment on March 8, 2017, and VNRC AND VTTU filed a

response to the opposition on March 21, 2017. AW/VPC filed an additional response opposing the motion for summary judgment, and responding to ANR's statement of facts, on March 21, 2017. ANR filed a motion for leave to file a sur-reply, along with a sur-reply, on March 28, 2017.

ANR filed its motion for leave to file a sur-reply in response to a specific, discrete assertion made by AW/VPC in its March 21, 2017 response. A party does not normally have a right to file a sur-reply. V.R.C.P. 78(b)(1). When new issues are raised in a response, however, the opposing party may be entitled to file a sur-reply. Champlain Parkway Wetland CU Determination, No. 123-10-16 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Apr. 14, 2017) (Durkin, J.) (citations omitted). In the case now before us, AW/VPC's March 21, 2017 response raises a new issue to which we find it appropriate to allow ANR to respond. We therefore **GRANT** ANR's motion for leave to file a sur-reply.

For the reasons set out in detail below, VNRC and VTTU's motion for summary judgment on AW/VPC's amended Question 3 is **GRANTED**, and VNRC and VTTU's motion for summary judgment on AW/VPC's amended Questions 4, 5, 7, 8, 9, 11, and 12 is **DENIED**.

## II. Legal and Regulatory Framework

Section 401(a)(1) of the Federal Clean Water Act (CWA) requires an "applicant for a Federal license or permit for any activity . . . which may result in any discharge into . . . navigable waters" to present a water quality certification (§ 401 certification) to the licensing or permitting agency. 33 U.S.C. § 1341(a)(1). The purpose of the § 401 certification is to ensure that the activity to be licensed or permitted will comply with "effluent limitations and other limitations" required by the CWA and "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). The certifying agency can impose reasonable conditions and limitations in a § 401 certification to ensure compliance with these laws. PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology, 511 U.S. 700, 712 (1994); 33 U.S.C. § 1341(d).

In Vermont, the legislature has delegated the responsibility for administering § 401 certification to ANR. 10 V.S.A. § 1004.

The phrase "any other appropriate requirement of State law" has been only partly defined.

3

Pursuant to CWA § 303, states are required to adopt water quality standards, which are then approved by the U.S. Environmental Protection Agency (EPA). 33 U.S.C. § 1313 (calling for water quality standards); 40 C.F.R. Part 131 (EPA regulations guiding the establishment of water quality standards). The U.S. Supreme Court has held that state water quality standards adopted pursuant to CWA § 303 are among the "other limitations" that must be complied with for § 401 certification, and that "limitations to assure compliance with state water quality standards" also fall into the category of "other appropriate requirement[s] of state law" required by § 401 certification. PUD No. 1, 511 U.S. at 713; 40 CFR § 121.2(a)(3) (indicating that a § 401 certification must give "reasonable assurance" that the activity will not violate state water quality standards).

Vermont has adopted the Vermont Water Quality Standards (VWQS) pursuant to CWA § 303.[2] In re Clyde River Hydroelectric Project, 2006 VT 11, ¶ 3, 179 Vt. 606. , Any § 401 certification issued in Vermont must ensure that the activity to be certified will comply with the VWQS. See PUD No. 1, 511 U.S. 700; 40 CFR § 121.2(a)(3)

The Supreme Court has declined to "speculate on what additional state laws, if any, might be incorporated by [the 'other appropriate requirement of state law'] language" set out in CWA § 401. PUD No. 1, 511 U.S. at 713.[3]

In the case now before us, MWL is applying to the Federal Energy Regulatory Commission (FERC) for a license for the Morrisville Hydroelectric Project (the Project), and has applied to ANR for a § 401 certification as part of the FERC license application process. ANR issued a § 401 certification, and MWL, AW/VPC, VNRC, and VTTU appealed that certification to the Environmental Division. See 10 V.S.A. § 8504(a).

In taking the appeal of the § 401 certification, our role is to determine whether the Project complies with the provisions of CWA specified in § 401, the VWQS, and any other appropriate

---

[2] The VWQS state that they are intended to achieve the goals set out in the CWA and 10 V.S.A. § 1250, which is the first section of the Vermont Water Pollution Control Act. VWQS § 1-02.

[3] Prior to the Supreme Court's decision in PUD No. 1, some state courts interpreted this provision broadly as "a congressional authorization to the states to consider all state action related to water quality in imposing conditions on section 401 certificates." State, Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson Cty., 849 P.2d 646, 653 (Wash. 1993), aff'd sub nom. PUD No. 1, 511 U.S. 700 (1994) (citing Arnold Irr. Dist. v. Dep't of Envtl. Quality, 717 P.2d 1274, 1280 (1986)). Others read this language more narrowly. Niagara Mohawk Power Corp. v. N.Y. State Dep't of Envtl. Conservation, 624 N.E.2d 146, 150 (N.Y. Ct. App. 1993).

4

state law; and whether any conditions or limitations should be imposed in the § 401 certification to ensure compliance with these laws. See 10 V.S.A. § 8504(h) (calling for de novo review).[4]

### III.  AW/VPC Question 1

AW/VPC moves for summary judgment on its Question 1, and ANR moves to dismiss AW/VPC Question 1.

#### a.  Motion to Dismiss

ANR moves to dismiss AW/VPC Question 1 for "failure to state a claim upon which relief can be granted." V.R.C.P. 12(b)(6). When considering such a motion, we "must take the factual allegations in the complaint as true, and consider whether 'it appears beyond doubt that there exist no facts or circumstances that would entitle the [moving party] to relief.'" Colby v. Umbrella, Inc., 2008 VT 20, ¶ 5, 184 Vt. 1 (quoting Alger v. Dep't of Labor & Indus., 2006 VT 115, ¶ 12, 181 Vt. 309).

As explained above, MWL applied for a § 401 certification to satisfy 33 U.S.C. § 1341(a)(1). Section 1341(a)(1) provides that if the certifying agency—here, ANR—"fails or refuses to act on a request for certification" within one year after receipt of the request, then "the certification requirements of this subsection shall be waived with respect to such Federal application."

AW/VPC Question 1 asks "[w]hether [ANR] waived issuance of a Water Quality Certification for the [Project] by failing to act on the application for Water Quality Certification . . . within one (1) year of receiving an application, in accordance with Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1)."

In its motion to dismiss, ANR argues that FERC, as the agency to which MWL is applying for a license, has exclusive authority to decide whether the certification requirement has been waived, and that ANR, and the Environmental Division on review, does not have authority to make this determination.[5] AW/VPC disputes this assertion.

---

[4] Although the VWQS were amended effective January 15, 2017, in the matter now before us we consider compliance with the VWQS that went into effect October 30, 2014. Under our vested rights doctrine, the earlier VWQS were in effect when the application in question was filed and therefore apply to this case. See Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181 (1981); VWQS § 1-10(A)(2).

[5] At its base, this challenge asserts that the Environmental Division does not have jurisdiction, an assertion more properly raised pursuant to V.R.C.P. 12(b)(1). Regardless, the standards for reviewing 12(b)(6) and 12(b)(1)

5

When a state agency issues a § 401 certification, state courts have jurisdiction to review the determinations made in that § 401 certification, while federal courts generally do not. Roosevelt Campobello Int'l Park Comm'n v. U.S. E.P.A., 684 F.2d 1041, 1056 (1st Cir. 1982); 40 C.F.R. § 124.55(e). This is because "the breadth of State authority under Section 401 results in most challenges to a [§ 401 certification] implicating only questions of State law." Alcoa Power Generating Inc. v. F.E.R.C., 643 F.3d 963, 971 (D.C. Cir. 2011) (citing City of Tacoma, Wash. v. FERC, 460 F.3d 53, 67 (D.C. Cir. 2006)).

While the federal licensing agency that the § 401 certification is issued for (in this case, FERC), and the D.C. Circuit Court on appeal from that agency's decision, have no jurisdiction over § 401 certification challenges that implicate only questions of state law, they do have jurisdiction to determine whether the § 401 certification complies with the certification requirements set out in CWA § 401. Id. This is because whether a § 401 certification is invalid because the certifying state agency failed to "'act on a request for certification' within the statutory one-year period" is a requirement set out in CWA § 401, and therefore "is a question of federal law." Id. at 971–72 (quoting 33 U.S.C. § 1341(a)(1)).

While federal courts have jurisdiction, this does not mean that state courts do not have jurisdiction over the same question. State courts generally have concurrent jurisdiction over federal claims. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478 (1981) (citations omitted). Congress can divest state courts of this concurrent jurisdiction either "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." Id. The statute here simply states that if the certifying agency fails to act within one year, "the certification requirements of this subsection shall be waived with respect to such Federal application." 33 U.S.C. § 1341(a)(1). Nothing in the statute indicates an intent to divest state courts of jurisdiction over determining whether the one-year timeline has been met. Indeed, at least one state supreme court decision considers whether a state certifying agency failed to comply with the one-year requirement in

---

are sufficiently similar that our analysis would be the same under either standard. See Rheaume v. Pallito, 2011 VT 72, ¶ 2, 190 Vt. 245.

6

CWA § 401. <u>FPL Energy Maine Hydro LLC v. Dep't of Envtl. Prot.</u>, 2007 ME 97, ¶¶ 15–23, 926 A.2d 1197.[6]

The one-year review requirement in the CWA is similar to a Vermont statute requiring municipal panels to render a decision within a certain period of time after holding a hearing on a permit application. 24 V.S.A. § 4464(b)(1). If the municipal panel fails to comply with this timeline, the application is deemed approved. <u>Id</u>. The purpose of deemed approval is to "remedy indecision and protracted deliberations on the part of zoning boards and to eliminate deliberate or negligent inaction by public officials." <u>In re Morrill House, LLC</u>, 2011 VT 117, ¶ 8, 190 Vt. 652 (mem.) (quoting <u>In re Ashline</u>, 2003 VT 30, ¶ 13, 175 Vt. 203); compare to <u>Alcoa Power</u>, 643 F.3d at 972 ("In imposing a one-year time limit on States to 'act,' Congress plainly intended to limit the amount of time that a State could delay a federal licensing proceeding without making a decision on the certification request.").[7]

In cases where the issue of deemed approval is raised, we have jurisdiction to consider whether the municipal panel below complied with the statutory timeline in issuing a decision. See, e.g., <u>Brisson Stone, LLC v. Town of Monkton</u>, 2016 VT 15, ¶ 25 (Vt. Feb. 12, 2016). Likewise,

---

[6] The question of whether the state court has jurisdiction over determining compliance with the one-year requirement is not addressed in the decision.

In <u>FPL Energy</u>, the state certifying agency granted an application for a § 401 certification within one year of the application being filed. 2007 ME 97, ¶ 4. Following an appeal in state trial court by a group of non-governmental organizations, and more than one year after the application was filed, the state agency vacated its initial decision and denied the application for a § 401 certification. <u>Id</u>. ¶¶ 4–6. FPL appealed that denial in state trial court, which affirmed, and then to the Maine Supreme Court. <u>Id</u>. ¶ 1.

At the Supreme Court, FPL submitted that because the vacation and denial was issued outside of the one-year time period, the § 401 certification requirement was waived. <u>Id</u>. ¶ 1. In the parallel licensing matter, FERC disagreed, holding that there is "nothing in the language of section 401 to suggest that a State must not only act on the certification request but also take action on any appeals that might subsequently be filed within one year." <u>FPL Energy Maine Hydro LLC</u>, 108 FERC ¶ 61261, 62431 (Sept. 21, 2004). FERC stayed the matter pending resolution of the § 401 certification appeal—which also raised other arguments—in state court. <u>Id</u>. Without deferring to FERC's decision regarding the one-year time period, the Maine Supreme Court also disagreed with FPL, based largely on its conclusion that the legislative history of Section 401 shows "a congressional intent that an agency take action on an application within one year," but not that "all in-state appeals . . . be completed within the same one-year deadline." <u>FPL Energy</u>, 2007 ME 97, ¶ 23.

In short, compliance with the one-year period was addressed by both FERC and the state court in this case.

[7] This analogy is imperfect because once a municipal permit application is deemed approved by the Court, the matter is concluded save for appeals. The § 401 certification is unlike a final permit, because it does not conclude the matter—instead, the § 401 certification is presented to the ultimate permitting agency, which then determines whether to grant the permit.

we have jurisdiction here to consider whether ANR complied with the statutory timeline set out in Section 401. For this reason, we disagree with ANR's argument that FERC—and not the Environmental Division—has exclusive authority to decide whether the certification requirement has been waived. ANR's motion to dismiss AW/VPC Question 1 is therefore **DENIED.**[8]

### b. Motion for Summary Judgment

We next turn to AW/VPC's motion for summary judgment on its Question 1, and recite the following facts solely for the purpose of ruling on this motion.

1. On April 22, 2013, Craig Myotte, Manager of MWL, sent an email to Jeff Crocker at ANR with a § 401 certification application attached. In the email, Mr. Myotte states, "I would appreciate it if you could review the document to see if it meets the ANR's requirements." The attached application is signed by Mr. Myotte, and dated April 19, 2013.

2. On April 22, 2013, Mr. Crocker responded by email, stating that the § 401 certification application "will meet ANR requirements." He notes that the application has the incorrect ANR address on it, further notes that he is in the process of updating ANR's new address on the web site, and that "the application I sent you via email has the correct address. I just want to make sure you send the application to the Montpelier address."

3. On April 25, 2013, MWL applied to FERC for a license. An exhibit to the application states that MWL "has filed an application for Water Quality Certification with [ANR]."

4. On June 14, 2013, FERC sent a letter to Mr. Myotte indicating that MWL's FERC application had a number of deficiencies. On November 5, 2013, FERC issued notice that a complete application had been filed.

---

[8] In reaching this conclusion, we are aware that FERC has explained it "ha[s] the authority to consider whether to accept conditions contained in late-filed" § 401 certification, and that it "routinely do[es] so." Cent. Vermont Pub. Serv. Corp., 113 FERC ¶ 61167, 61654 ¶ 20 (Nov. 17, 2005); see also Puerto Rico Sun Oil Co. v. U.S. E.P.A., 8 F.3d 73, 79 (1st Cir. 1993) (giving deference to the EPA's interpretation of its regulations and Section 401 to give it discretion to "declare a waiver" once the one-year deadline has passed, or to decide to accept a certification filed late).

Because we sit in the position of the agency whose action we are reviewing, it is not within the scope of our review to consider whether FERC might accept a § 401 certification where the certifying agency has failed to comply with the one-year timeline. Furthermore, a footnote in the Central Vermont FERC decision indicates skepticism that a certifying state agency has the authority to extend the one-year deadline to act, given that the purpose of the deadline is "to preclude undue delay by the states." Id. ¶ 16 n.15. Again, as we sit in the certifying agency's place, that skepticism may be extended to any decision we might render regarding whether FERC might accept a § 401 certification despite noncompliance with the one-year timeline.

8

5. On January 15, 2014, FERC sent a letter to Mr. Myotte indicating that MWL was one week overdue in filing either a copy of a § 401 certification; a copy of the request for § 401 certification, including proof of the date the certifying agency received the request; or evidence of a waiver of the § 401 certification.

6. On January 30, 2014, Mr. Crocker forwarded his April 22, 2013 email to Mr. Myotte, stating "Here was my response to your initial email in April indicating that you would need to mail a hard copy" of the § 401 certification application to ANR.

7. Later that same day, Mr. Myotte emailed a § 401 certification application, dated January 30, 2014, to Mr. Crocker. In a response email, Mr. Crocker indicated that the application looked complete, adding "Typically you would mail a copy of the application to us for processing and we issue a letter to you acknowledging its receipt and that it is complete. I can accept the electronic copy of the application since your Final license application has been deemed complete by FERC, and will issue a letter that we have receive[d] the application."

8. A short time later, Mr. Crocker emailed Mr. Myotte, asking him to revise the application to include the Lake Elmore Development, which Mr. Myotte did and sent back to Mr. Crocker. The revised application is also dated January 30, 2014.

9. On February 3, 2014, Mr. Crocker sent a letter to Mr. Myotte acknowledging the receipt of the § 401 certification application on January 30, 2014.

10. On February 4, 2014, MWL filed with FERC the January 30, 2014 § 401 certification application and February 3, 2014 acknowledgement from ANR.

11. On November 7, 2014, Mr. Myotte sent a letter to ANR via email stating that MWL was withdrawing its January 30, 2014 § 401 certification application and simultaneously re-applying for § 401 certification.

12. In a September 9, 2015 letter to ANR, MWL stated that it was withdrawing its November 7, 2014 application and re-applying for § 401 certification.

13. ANR issued the § 401 certification on August 9, 2016.

We grant summary judgment to a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). "In determining whether there is a

9

genuine issue as to any material fact, we will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356 (citation omitted). In this case, AW/VPC and ANR have both submitted affidavits and other evidentiary material to support their statements of facts and responses.

AW/VPC contends that Mr. Myotte emailed the § 401 certification application dated April 19, 2013 to Mr. Crocker on April 22, 2013 intending it to be accepted as a complete application by ANR. ANR disputes this and characterizes the April 22, 2013 email as a preliminary communication between ANR and MWL to allow MWL to receive feedback on its § 401 certification application. ANR argues that a formal application was not submitted until January 30, 2014.

On the record now before us, we are unable to conclude that the undisputed material facts entitle AW/VPC judgment as a matter of law on its Question 1. Instead, the evidence largely supports ANR's interpretation of events.

While somewhat vague, the April 22, 2013 email communication from Mr. Crocker suggests that a complete application must be sent by regular mail to ANR. There is nothing in the record indicating that this was done at that time.

In addition, the April 19, 2013 application was incomplete, as it did not include the Lake Elmore Development. The second version of the January 30, 2014 was complete, as it did include this part of the Project. See In re Keystone Dev. Corp., 2009 VT 13, ¶ 5, 186 Vt. 523 (mem.) (explaining that "a permit applicant gains a vested right in the governing regulations in existence when a full and complete permit application is filed") (citing Smith v. Winhall Planning Commission, 140 Vt. 178, 182 (1981)).

Furthermore, MWL and ANR have conducted themselves in a manner consistently demonstrating that both parties believed the § 401 certification application was submitted on January 30, 2014. When FERC asked MWL for information on the status of the § 401 certification on January 15, 2014, MWL did not send FERC the April 19, 2013 § 401 certification application or the April 22, 2014 communication with MWL to support an assertion that its application had been filed at that time. Nor did MWL contact ANR for information on the status of the April 19, 2013

application.  Instead, MWL submitted the January 30, 2014 application to ANR and then sent documents to FERC stating that the application was submitted on January 30, 2014.  On November 7, 2014, MWL withdrew its January 30, 2014 application and simultaneously re-applied.  In later withdrawals, MWL again referred to the application as being originally submitted on January 30, 2014.  Throughout this entire course of events, both MWL and ANR treated the January 30, 2014 application as the official and complete application.

Notably, while MWL has appealed parts of the § 401 certification, it does not argue that the § 401 certification is invalid for failing to comply with the one-year timeline.  MWL has not weighed in on AW/VPC's Question 1.

For these reasons, we conclude, on the record now before us, that MWL submitted its § 401 certification application on January 30, 2014, and that, in light of subsequent withdrawals and re-applications, ANR complied with the one-year timeline in Section 401.  We are therefore inclined to grant summary judgment in favor of ANR on AW/VPC Question 1.  Because ANR has not filed a cross-motion on this question, however, we may not grant it summary judgment without giving all parties notice and an opportunity to respond.  V.R.C.P. 56(f)(1).  We hereby give all parties 30 days from the date of this decision to file briefs and supporting documents with the Court regarding the question of whether ANR complied with the one-year timeline in Section 401.

## IV.    AW/VPC Question 14

ANR moves to dismiss AW/VPC amended Question 14 for failure to state a claim on which relief can be granted.[9]

---

[9] AW/VPC argues that ANR's motion to dismiss AW/VPC Question 14 should be converted to a motion for summary judgment pursuant to the following provision set out in V.R.C.P. 12(b):

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

AW/VPC suggests in its opposition that if the motion is converted to one for summary judgment, the parties should be allowed to complete discovery on whether the "flow alteration regime in the § 401 certification violate[s] the Anti-Degradation Policy in its Water Quality Standards."  From the pleadings, it is unclear how such discovery relates to resolving amended Question 14, which ANR appears to challenge by raising a purely legal question. Furthermore,

11

AW/VPC amended Question 14 asks "[t]o the extent that the [§ 401 certification] renders the project uneconomical and results in decommissioning, whether the Green River Dam should be removed due to its adverse impacts."

ANR contends that the question of decommissioning falls outside the scope of the matter on appeal. ANR notes that the issue before the Court is whether the Project complies with VWQS, other relevant state laws, and parts of the CWA. 33 U.S.C. §1341(a)(1), (d). Ultimately, the Court is tasked to either issue or deny a § 401 certification. ANR submits that decommissioning does not fall within the scope of this review, and the Environmental Division therefore has no jurisdiction to consider that issue. See 4 V.S.A. § 34 and 10 V.S.A. § 8504 (setting out the limited jurisdiction of the Environmental Division).

AW/VPC disagrees, arguing that ANR is proposing a flow regime that does not comply with the VWQS. Because of this, AW/VPS argues, the Court essentially has two options: deny the § 401 certification application, which would mean that FERC would not be able to license the project and the dam would have to be decommissioned and removed; or grant the § 401 certification application with the requirement that the project be operated in "true" run-of-river mode, which would render the dam uneconomical and therefore also require decommissioning.

Although filed as a motion to dismiss pursuant to V.R.C.P. 12(b)(6), because the motion asserts a lack of subject matter jurisdiction over the substance of amended Question 14, we consider the motion pursuant to V.R.C.P. 12(b)(1). We review a 12(b)(1) motion by accepting "all uncontroverted factual allegations of the complaint . . . as true and constru[ing them] in the light most favorable to the nonmoving party." Rheaume v. Pallito, 2011 VT 72, ¶ 2, 190 Vt. 245 (citing Jordan v. State Agency of Transp., 166 Vt. 509, 511 (1997)).

We agree with ANR that we do not have jurisdiction to determine "whether the Green River Dam should be removed due to its adverse impacts."

There are a number of procedures through which FERC may remove a dam. Michael T. Pyle, Beyond Fish Ladders: Dam Removal as a Strategy for Restoring America's Rivers, 14 Stan. Envtl. L.J. 97, 122 (1995). For example, if a dam becomes more expensive to maintain than to

---

ANR has not presented any matters outside the pleadings in its motion that would call for converting the motion to dismiss. We therefore decline to convert this to a motion for summary judgment.

12

remove, a licensee may surrender their license. Id. at 126; 16 U.S.C. § 799. FERC can also include a decommissioning condition when issuing a new license, id. at 129; 129 n.191 (listing cases), and may also be able to directly order dam removal, Id. at 133–37.

While the § 401 certification might impact the economic feasibility of a dam and therefore play into FERC's decision regarding decommissioning or removal, the issue of decommissioning and removal is a subsequent step which falls outside of our immediate scope of review. For this reason, we conclude that we have no jurisdiction to address whether the dam should be decommissioned or removed. ANR's motion to dismiss AW/VPC amended Question 14 is therefore **GRANTED**.

### V.    MWL's Amended Questions 1, 2, 3, 6, and 8

VNRC and VTTU move to dismiss MWL amended Questions 1, 2, 3, 6, and 8 pursuant to civil rule 12(b)(6) for failure to state a claim upon which relief can be granted. ANR also moves to dismiss part of MWL Question 6, and for summary judgment on MWL Questions 1, 2, and 3.

These questions generally ask whether the § 401 certification should take economic and social factors into account.[10]

---

[10] We note that "economic and social" are broad terms. We use them in a general sense here to frame the discussion. The challenged questions read as follows:

Question 1: "whether [ANR] failed to strike a balance between competing water uses in the public interest as required by ANR Streamflow Procedure in issuing the [§ 401 certification], including, but not limited to the policy of the State of Vermont to decrease Vermont's dependence on non-renewable energy sources."

Question 2: "For all facilities, whether ANR failed to adequately consider any public benefits or detriments in issuing the [§ 401 certification], including any public benefits or detriments associated with increasing conservation flows for previously approved facilities, as required by ANR Streamflow Procedure, Part F."

Question 3: "Whether ANR was required by [VWQS], ANR Streamflow Procedure, and Vermont Statutes, such as 10 V.S.A. § 1421 and 10 V.S.A. § 1423(b)(3), to consider economic and social issues when issuing the [§ 401 certification]."

Question 6: "Whether ANR failed to give adequate consideration to the decreased flood protection, and the inability of MWL to perform emergency generation during an emergency of the New England Grid and peak demand hours, that would be caused by the drawdown and downstream flow conditions imposed in the [§ 401 certification]."

Question 8: "Regarding the Green River facility, whether ANR failed to give due consideration to the dam safety concerns posed by spillage that would result from the restrictions on reservoir drawdown and downstream flows."

13

### a. The Streamflow Procedure

VNRC and VTTU contend that MWL amended Questions 1, 2, 3, 6, and 8 should be dismissed because they ask the Court to weigh economic and social factors, neither of which is within the Court's authority to consider. Similarly, ANR argues for summary judgment on MWL Questions 1, 2, and 3 because the certifying agency does not have any authority to "take economic or social factors into account when setting limitations or conditions to ensure compliance with the VWQS." ANR Mot. Dism. at 9.

MWL counters that economic and social factors can, or must, be considered under ANR's Agency Procedure for Determining Acceptable Minimum Stream Flows (the Streamflow Procedure) and 10 V.S.A. §§ 1421 and 1423(b)(3).

We conclude that the Streamflow Procedure does not allow or require consideration of economic or social factors in this case, for two main reasons. First, the § 401 certification does not have to ensure compliance with the Streamflow Procedure, because, as explained below, that procedure is not an "appropriate requirement of state law." 33 U.S.C. § 1341(d). Second, state and federal water quality laws do not authorize consideration of economic or social factors in this case; because the Streamflow Procedure was created pursuant to those laws, it cannot supersede them by allowing consideration of economic or social factors.

> ### i. The CWA does not require compliance with the Streamflow Procedure because it is not an appropriate requirement of state law

As explained above, the purpose of a § 401 certification is to satisfy requirements of the CWA. 33 U.S.C. § 1341(a)(1). A § 401 certification must "set forth effluent limitations and other limitations, and monitoring requirements to ensure" that the applicant for a federal license will comply with standards set out in the CWA and "any other appropriate requirement of state law." Id. § 1341(d). The VWQS are one such appropriate requirement of state law, in part because the VWQS are adopted pursuant to a mandate set out in the CWA. PUD No. 1, 511 U.S. at 712–13.

The Vermont Administrative Procedure Act (VAPA) distinguishes rules from procedures. 3 V.S.A. § 801. Under VAPA, a rule applies generally to "implement[], interpret[], or prescribe[] law or policy," and is adopted through a process involving notice and comment. Id. §§ 801(9) and 836–44. Courts alternatively refer to rules as "regulations." See, e.g., C&S Wholesale

14

Grocers, Inc. v. Dep't of Taxes, 2016 VT 77A, ¶ 14. Agency rules and regulations "have the force and effect of law." 3 V.S.A. § 845(a).

A procedure is a practice that is maintained in the public records. Id. §§ 801(8) and 835. A practice is "a substantive or procedural requirement of an agency, affecting one or more persons who are not employees of the agency, which is used by the agency in the discharge of its powers and duties." Id. § 801(7). "Agency protocols and procedures . . . do not have the force or effect of a statute or . . . regulation. Rather, they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation." King v. Gorczyk, 2003 VT 34, ¶ 22, 175 Vt. 220 (quoting Wanzer v. Dist. of Columbia, 580 A.2d 127, 133 (D.C. Ct. App. 1990)). "An internal agency 'practice or procedure' is primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." Id. ¶ 25 (quotation omitted); see also In re Woodford Packers, Inc., 2003 VT 60, ¶¶ 13–17, 175 Vt. 579 (mem.) (holding that ANR could change its methodology for determining floodways without notice, because that methodology was a "practice" and not a "rule").

The VWQS are rules or regulations that carry the force of law. It is partly for this reason that they are "appropriate requirement[s] of state law" to be considered by an agency issuing a § 401 certification. See PUD No. 1, 511 U.S. at 713. The Streamflow Procedure does not carry the force of law, however, and therefore cannot be an "appropriate requirement of state law." ANR is therefore not required to follow the Streamflow Procedure when determining whether to issue a § 401 certification or in determining limitations or conditions to be included in a § 401 certification.

> ii. *The Streamflow Procedure was created to give effect to state and federal water laws, and cannot be interpreted in a way that goes against or beyond those laws.*

As explained above, the purpose of the § 401 certification is to ensure that a proposed activity complies with the CWA, the VWQS, and any other appropriate state laws. 33 U.S.C. § 1341(d). PUD No. 1, 511 U.S. at 713.

The Streamflow Procedure appears to have been put in place to facilitate the implementation of the VWQS and its Hydrology Policy. See Streamflow Procedure at 1 (stating

15

that it is intended to serve the state water quality policies set out in 10 V.S.A. § 1250, and an executive order calling for a decrease in Vermont's dependence on non-renewable sources of energy[11]); VWQS § 1-02 (stating that the VWQS are rules intended to achieve the goals set out in 10 V.S.A. § 1250 and the CWA); In re Clyde River Hydroelectric Project, 2006 VT 11, ¶ 13, 179 Vt. 606 (indicating that the Streamflow Procedure was created under the authorization of, and to implement the purposes of, the VWQS Hydrology Policy).

Because the Streamflow Procedure is not a rule or regulation, it is subsidiary to, and cannot supersede, the VWQS, CWA, and Vermont water quality policy that it was created to implement. Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 748 (2004) ("neither an unreasoned statement in [a] manual nor allegedly long-standing agency practice can trump a formal regulation with the procedural history necessary to take on the force of law").

The VWQS only require consideration of social and economic factors when regulating high-quality waters. VWQS 1-02(C). The parties agree that high-quality waters are not at issue in this case, and therefore this provision of the VWQS does not apply. Other sections of the VWQS that deal with flow values do not authorize consideration of economic or social factors. See, e.g. VWQS §§ 1–02(E)(1), 2-02.

In addition, the state water quality policy says nothing about balancing water quality against social and economic considerations. 10 V.S.A. § 1250.

Because the Streamflow Procedure was created to carry out the purposes of state and federal water quality laws, and those laws do not authorize balancing water quality protection against economic and social considerations, we conclude that the Streamflow Procedure cannot be interpreted to authorize or require ANR to consider economic and social concerns when issuing a § 401 certification.

We note that the Water Resources Board reached the same conclusion over 20 years ago in holding that economic and "so-called societal impacts" of a proposed activity are not to be considered in determining whether to issue a § 401 certification, because those impacts are not "germane to determining whether the Project meets the [VWQS] and other applicable state law

---

[11] The Streamflow Procedure does not specify which executive order this is.

16

pertaining to water quality concerns." In re Lamoille River Hydroelectric Project § 401 Certification, No. WQ-94-03 and -04, Preliminary Rulings (Water Res. Bd. Aug. 15, 1995).[12]

We are further convinced that consideration of economic considerations is not appropriate by referring to decisions addressing the CWA National Pollutant Discharge Elimination System (NPDES) permits, which also look to whether an activity complies with state water quality standards. See In re Stormwater NPDES Petition, 2006 VT 91, ¶ 6, 180 Vt. 261; In re Entergy Nuclear Vermont Yankee Discharge Permit 3-1199, 2009 VT 124, ¶ 45, 187 Vt. 142. Courts have held in NPDES cases that economic factors are not to be considered or balanced against compliance with water quality standards. E.g., Montpelier WWTF Discharge Permit, No. 22-2-08 Vtec, slip op at 21 (Vt. Envtl. Ct. Jun. 30, 2009) (Durkin, J.).

Because the CWA, the Vermont state water quality policy, and the VWQS do not allow economic and social considerations to be taken into account when regulating water quality, and the Streamwater Procedure was adopted pursuant to these statutes and regulations, the Streamflow Procedure also cannot allow economic and social factors to be considered.

### b. 10 V.S.A. § 1421 and 1423(b)(3)

MWL argues that 10 V.S.A. § 1421 and 1423(b)(3) fall into the "appropriate requirement of state law" provision and must be considered; and that they require a § 401 certification to take social and economic factors into account.

ANR responds that § 1421 sets out policy goals directed at the state, and that § 1423(b)(3) is part of a directive to ANR to create a water resources plan, and are therefore not applicable to MWL.

10 V.S.A. § 1421 reads:

To aid in the fulfillment of the State's role as trustee of its navigable waters and to promote public health, safety, convenience, and general welfare, it is declared to be in the public interest to make studies, establish policies, make plans, make rules, encourage and promote buffers adjacent to lakes, ponds, reservoirs, rivers, and streams of the State, encourage and promote protected river corridors adjacent to rivers and streams of the State, and authorize municipal shoreland and river corridor protection zoning bylaws for the efficient use, conservation,

---

[12] When ruling on an appeal, we give Water Resources Board decisions the same weight and consideration as prior Environmental Division decisions. 10 V.S.A. § 8504(m).

development, and protection of the State's water resources. The purposes of the rules shall be to further the maintenance of safe and healthful conditions; prevent and control water pollution; protect spawning grounds, fish, and aquatic life; control building sites, placement of structures, and land uses; reduce fluvial erosion hazards; reduce property loss and damage; preserve shore cover, natural beauty, and natural stability; and provide for multiple use of the waters in a manner to provide for the best interests of the citizens of the State.

10 V.S.A. § 1423(b)(3) reads:

The Secretary shall prepare a comprehensive plan relating to water resources as a guide for the preparation of a State, regional, or municipal land use or development plan. The plan shall be based on the classification of waters pursuant to chapter 47 of this title. The plan shall to the extent possible give consideration to any existing regional or municipal plans which are compatible with the interests of the State. The primary purpose of the plan shall be for the preventive control of pollution, giving due consideration to necessary development and growth. The plans shall be governed by the following general standards . . . . Areas in which the existing or potential economic value of public, recreational or similar uses exceeds the existing or potential economic value of any other use shall be classified primarily on the basis of the higher economic use value.

We conclude that these statutes do not have to be considered in a § 401 certification. Unlike the VWQS, which are applicable to § 401 certification as discussed above, these statutes set out broad directives for the state and a state agency. These statutes do not appear to be relevant to the matter at hand—appropriate requirements of state law, in other words—because there is no way that one could say whether a hydroelectric facility could comply with, or violate them. As such, we conclude that these are not "appropriate requirement[s] of state law" to be taken into account in a § 401 certification.

### c. Motions to Dismiss and for Summary Judgment

VNRC and VTTU move to dismiss MWL amended Questions 1, 2, 3, 6, and 8 pursuant to civil rule 12(b)(6) for failure to state a claim upon which relief can be granted. ANR also moves to dismiss the part of MWL Question 6 that relates to electricity generation, and for summary judgment on MWL Questions 1, 2, and 3.

Because the Streamflow Procedure, 10 V.S.A. § 1421, and 10 V.S.A. § 1423(b)(3) are not "appropriate requirement[s] of state law" to be taken into account in a § 401 certification and, insofar as ANR is to apply the Streamflow Procedure, it cannot be interpreted to allow social or economic factors to be considered in a § 401 certification, VNRC and VTTU's motion to dismiss

18

MWL Questions 1, 2, and the part of Question 3 that deals with the Streamflow Procedure, 10 V.S.A. §§ 1421 and 1423(b)(3) is **GRANTED**.

Because there is no "appropriate requirement of state law" that allows consideration of economic and social factors, and MWL Questions 6 and 8 raise social and economic concerns insofar as they raise concerns related to flooding, safety, and ability to generate electricity, VNRC and VTTU's motion to dismiss MWL Questions 6 and 8 is also **GRANTED**.

We grant summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). Regarding the part of Question 3 addressing the VWQS, the one undisputed material fact is that the Project does not affect any high-quality waters, which means that the VWQS do not allow for consideration of social and economic factors. Because the VWQS do not permit social or economic factors to be considered, ANR's motion for summary judgment on MWL Question 3 is **GRANTED**. By granting VNRC and VTTU's motion to dismiss MWL Questions 1, 2, and 6, ANR's motions to dismiss and for summary judgment on those questions is **MOOT**.

## VI. AW/VPC's amended Questions 3, 4, 5, 7, 8, 9, 11, and 12

VNRC and VTTU move for summary judgment on AW/VPC's amended Questions 3, 4, 5, 7, 8, 9, 11, and 12. ANR supports the motion, and also challenges AW/VPC's amended Question 6 and a portion of Question 10. [13]

---

[13] ANR does not, however, formally move for summary judgment on AW/VPC's amended Questions 6 and 10.

The challenged questions are:

Question 3: "Whether whitewater boating on the Green River during natural high flow events and during scheduled recreational releases is a designated use protected under Section 3-04(A)(6) of the [VWQS] for Class B waters, and if so, whether the Water Quality Certification should ensure the continued opportunity for whitewater boating on the Green River during natural high flow events and during scheduled recreational releases."

Question 4: "Whether the Water Quality Certification for the Green River Development must achieve and maintain a high level of quality that fully supports whitewater boating as required by Section 3-04(B)(7) of the [VWQS] for Class B waters."

Question 5: "Whether the Water Quality Certification should be conditioned in order to ensure the full support of whitewater boating as required by Section 3-01(C)(1) of the [VWQS] for Class B waters."

Question 6: "Whether ANR has conducted any site specific flow studies documenting the impact of whitewater boating in compliance with Section 3-01(C) and Section 1-02(E) of the [VWQS] and if not whether any determination by ANR regarding impacts of whitewater boating is entitled to deference by the Court."

19

AW/VPC amended Question 3 asks whether whitewater boating on the Green River is a designated use.

AW/VPC amended Question 4 refers to a section of the VWQS that provide for the protection of conditions for boating, and presumes that this would also specifically protect whitewater boating. This appears to rest on the assumption that whitewater boating is an existing or designated use. AW/VPC amended Question 5 refers to a section of the VWQS that refers to requirements to ensure the full support of uses. While boating is a use designated in the VWQS, this question assumes that whitewater boating is also an existing or designated use. AW/VPC amended Question 6 refers to sections of the VWQS that require site-specific flow studies to ensure the full support of uses; again, this assumes that whitewater boating is an existing or designated use.

AW/VPC amended Question 7 asks whether whitewater boating on the Green River is an existing use. AW/VPC amended Questions 8, 9, 11, and 12 rest on the assumption that whitewater boating is an existing use.

---

Question 7: "Whether whitewater boating on the Green River is an existing use protected by the ANR Interim Anti-Degradation Implementation Procedure and Section 1-03 of the [VWQS] and if not whether any determination by ANR regarding impacts of whitewater boating is entitled to deference by the Court."

Question 8: "If whitewater boating on the Green River is such a protected existing use, whether the Water Quality Certification should be conditioned to maintain natural high flow events and include scheduled recreation releases in order to protect that use in accordance with Section VIII of the ANR Interim Anti-Degradation Implementation Procedure and Section 1-03 of the [VWQS]."

Question 9: "If whitewater boating on the Green River is a protected existing use under Section VIII of the ANR Interim Anti-Degradation Implementation Procedure and Section 1-03 of the [VWQS], whether scheduled whitewater boating releases are compatible with the fisheries management goals, as that term is used in the Water Quality Certification on appeal . . . for the Green River, will not result in any violation of the [VWQS], and should be included in the Water Quality Certification."

Question 10, in part: "Whether allowing [MWL] to operate in a store-and-release mode . . . during the "winter" . . . will reduce opportunities for whitewater boating that would occur under natural flow conditions as though the hydroelectric dam did not exist."

Question 11: "Whether the Water Quality Certification may be conditioned to eliminate or substantially interfere with existing whitewater boating opportunities in order to create a habitat that would not otherwise exist under natural flow conditions as though the hydroelectric dam did not exist."

Question 12: "Whether the Water Quality Certification may be conditioned such that it will eliminate or substantially interfere with existing whitewater boating opportunities in order to support other uses beyond what is required by the [VWQS] for class B waters."

The first part of AW/VPC amended Question 10 asks the court to consider how a portion of the § 401 certification would reduce opportunities for whitewater boating. ANR suggests that this need not be considered unless whitewater boating is an existing or designated use.

Of all the challenged questions, Questions 3, 4, 7, 8, and 9 specifically refer to the Green River.

The common issue raised by all of the challenged questions is whether whitewater boating, or whitewater boating on scheduled releases as they currently exist on waters affected by the Project, are existing uses or designated uses that must be maintained or protected in the § 401 certification. AW / VPC argues that whitewater boating is an existing or designated use, while VNRC, VTTU, and ANR argue that it is not.

We grant summary judgment to a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). "In determining whether there is a genuine issue as to any material fact, we will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Mylan Labs., 2004 VT 15, ¶ 15 (citation omitted).

### a. Undisputed Material Facts

The following facts are set out solely for the purpose of deciding the summary judgment motion now before the Court.

1.    The Green River is a Class B water and has not been assigned a water management type.

2.    The designated uses for the Green River are aquatic biota, wildlife, and aquatic habitat; acceptable as a source for a public water supply with filtration and disinfection; aesthetics; swimming and other primary contact recreation; boating, fishing and other recreational uses; and irrigation and agricultural uses. VWQS § 3-04(A).

3.    Whitewater boaters have been running the rapids on the Green River for years during natural high-water events.

4.    MWL has for the past five years also provided scheduled recreational releases specifically to allow for whitewater boating. Scheduled releases are done on short notice at the request of AW/VPC.

21

5. MWL uses the releases to generate power.

6. The § 401 certification issued to MWL would eliminate all scheduled whitewater releases, and would significantly limit or eliminate naturally occurring whitewater boating opportunities.

7. In the § 401 certification issued to MWL, ANR identified two existing uses at the Green River Development: aquatic biota, wildlife and aquatic habitat; and recreation. Certification finding ¶ 255. The certification appears to include angling and boating in the broader "recreation" use. Id. ¶ 256.

8. The § 401 certification also states that one of the conditions in the certification "will help to restore the frequency of natural high flow events and allow for whitewater boating when natural flows are compatible with boating. This certification is being conditioned such that the downstream flow regime will provide waters of a high quality that is suitable for and compatible with boating." Id. ¶ 239.

9. The 2016 Tactical Basin Plan for the Lamoille Basin includes "Appendix F: Existing Uses in the Lamoille Basin." 2016 Lamoille Basin Plan at 197, available at http://dec.vermont.gov/sites/dec/files/wsm/mapp/docs/2016-12-30_Lamoille_Tactical_Plan_FINAL.pdf. This appendix "presents the current list of Existing Uses determined for the Lamoille Basin." Id. at 135.

10. Appendix F includes sub-headings for the following uses: swimming, recreational boating, recreational fishing, and public water sources.

11. Under the sub-heading "Recreational Boating," Appendix F mentions whitewater boating, and flat water canoeing and kayaking. Id. "Table F2: Recreational Boating as an Existing Use of Specific Waters within the Lamoille Watershed" lists the Green River as a location with a "highly important" rating, noting under "characteristics that support the use": "Class IV-V, outstanding scenery and rapids, used by expert paddlers, only river in State with potential to support recreational dam releases on a steep creek." Id. at 199.

12. A study of whitewater boating on the Green River conducted by MWL for its FERC application concluded that "the Green River can provide a quality whitewater boating experience that includes a variety of advance paddler challenges with an above average length run in a picturesque setting." Green River Whitewater Study for the Morrisville Project (undated)

22

*available at*

http://elibrary.ferc.gov/IDMWS/common/downloadOpen.asp?downloadfile=20120306%2D502
6%2826972336%29%2Epdf&folder=358109&fileid=12909002&trial=1.

### b. Discussion

#### i. Whitewater boating is not a designated use.

AW/VPC amended Question 3 asks whether whitewater boating is a designated use. Questions 4, 5, and 6 assume that whitewater boating is a designated use or an existing use. [14]

The CWA and EPA regulations require states to identify designated uses in their water quality standards. 33 U.S.C. § 1313(c)(2)(A) (new or revised standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses"); 40 C.F.R. § 131.10 (setting out guidelines for "designation of uses").

EPA regulations define designated uses as "those uses specified in water quality standards for each water body or segment whether or not they are being attained." 40 C.F.R. § 131.3(f).

The VWQS define a designated use as "any value or use, whether presently occurring or not, that is specified in the management objectives for each class of water as set forth in §§ 3-02(A) [Class A(1) waters], 3-03(A) [Class A(2) waters], and 3-04(A) [Class B waters] of these rules." VWQS § 1-01(B)(14).

States have discretion to make designated uses more or less specific, as long as they are at least as specific as the uses identified in the CWA: drinking water supply; protection and propagation of fish, shellfish, and wildlife; recreation; agricultural; industrial; and navigation. 33 U.S.C. §§ 1251(a) (setting out goals and policy of CWA), 1313(c) (stating that water quality standards must take into consideration and protect CWA purposes); 40 C.F.R. § 131.10(c) (allowing, but not requiring, states to designate sub-categories of uses); U.S. Envt'l. Prot. Agency,

---

[14] ANR suggests that Question 4 refers to a section of the VWQS relating to management objectives for designated uses, not existing uses, and the question therefore depends on whitewater boating being a designated use. See VWQS § 3-04(B)(7). It is not clear to the Court that this section, titled "Water Quality Criteria for Class B Waters," applies only to designated uses and not to existing uses.

ANR further suggests that Questions 5 and 6 refer to the VWQS Hydrology Policy (§ 1-02(E)) and Hydrology Criteria (§3-01(C)) also depend on whether whitewater boating is a designated use; again, we see no reason why these sections would not apply if whitewater boating is an existing use.

23

Water Quality Standards Handbook §§ 2.3, 4.4.1 (1994) *available at* https://www.epa.gov/wqs-tech/water-quality-standards-handbook [hereinafter EPA Handbook].

Once a use is designated, the state is required to manage the water "to achieve and maintain a level of quality that fully supports" the use. VWQS § 3-04(A); see also 40 C.F.R. § 131.10(a) (designated uses are "to be achieved and protected"). There is no requirement to support more specific uses that have not been designated.

A state may not remove a designated use from its water quality standards unless the use is not an "existing use" and the use is not feasible under specific criteria set out in EPA regulations. 40 C.F.R. § 131.10(g); EPA Handbook § 2.7.

In summary, designated uses are those specified by the authorized agency—here, ANR—regardless of whether the use is actually occurring, and the agency has discretion to designate uses in a general or specific manner.

Here, ANR has set boating—and not whitewater boating—as a designated use in the Green River. Although windsurfing, tugboating, and gondola rowing also could be considered subcategories of boating, ANR has not specified them as designated uses on the Green River, Class B waters, or any other waters. The state therefore has no duty to achieve, support, or protect them as designated uses. The same is true for whitewater boating.

Because whitewater boating is not a designated use, VNRC and VTTU's motion for summary judgment on AW/VPC Question 3 is **GRANTED.**

> ii. *The Court is unable to determine at this time whether whitewater boating on the Green River is an existing use.*

AW/VPC Question 7 asks whether whitewater boating is an existing use on the Green River. Questions 4, 5, and 6 assume that whitewater boating is a designated use or an existing use. Questions 8, 9, 11, and 12 assume that whitewater boating is an existing use.

Existing uses are relevant to two provisions in EPA regulations. First, existing uses are relevant in determining whether a designated use is also an existing use, and therefore cannot be removed from state water quality standards. 40 C.F.R. § 131.10(g). Second, existing uses are relevant insofar as states are required to adopt antidegradation policies that protect and

24

maintain "[e]xisting instream water uses and the level of water quality necessary to protect . . . existing uses." 40 C.F.R. § 131.12(a)(1).

EPA regulations define existing uses as "those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards." 40 C.F.R. § 131.3(e). The VWQS provide a similar definition: "Existing use means a use which has actually occurred on or after November 28, 1975, in or on waters, whether or not the use is included in the standard for classification of the waters, and whether or not the use is presently occurring." VWQS § 1-01(B)(18). The U.S. Supreme Court has explained that the CWA antidegradation policy is intended to protect "existing *beneficial* uses of navigable waters, preventing their further degradation." PUD No. 1, 511 U.S. at 705 (emphasis added).

The EPA interprets the phrase "existing uses are those uses actually attained" to mean that "the use *and water quality necessary to support the use* . . . have been achieved." Letter from Denise Keener, Director, Standards and Health Protection Division, EPA, to Derek Smithee, Chief, Water Quality Programs Division, Oklahoma Water Resources Board (Sep. 5, 2008), part (1) *available at* https://www.epa.gov/sites/production/files/2014-10/documents/existinguse-smithee-letter.pdf [hereinafter Smithee letter] (emphasis added).

The EPA has explained that the prohibition on removing existing uses is not intended to prevent removal of an existing use when doing so "would result in improving the condition of a waterbody, i.e., facilitate[] attainment of a use closer to those supported by minimally impacted conditions." Id. For example, "if a state . . . stocks trout (a coldwater species) into a natural warmwater fishery, the existing use provision would not prevent removal of that stocked trout fishery use because a natural warm water fishery is closer to the minimally impacted condition." Id.

Unlike designated uses, states are not required to specify existing uses in their water quality standards. See 40 C.F.R. § 131.10. Nevertheless, according to the EPA Water Quality Standards Handbook, a state "selects the level of specificity it desires for identifying recreational existing uses," as long as they are as specific as the designated uses and the uses listed in CWA §§ 101(a) and 303(c). EPA Handbook § 4.4.1. The Handbook goes on to explain that:

> If the use classification system in a State is defined in broad terms such as . . . boating, then it is a State determination whether to allow changes in the type of

25

> . . . boating activity that would occur on a specific water body as long as the basic use classification is met. For example, if a State defines a use simply as "boating," it is the State's decision whether to allow something to occur that would change the type of boating from canoeing to power boating as long as the resulting water quality allows the "boating" use to be met.

Id.

The VWQS call for existing uses to be identified as part of the basin planning process, or on a case-by-case basis "during consideration of an application." VWQS §§ 1-03(B)(1), 1-02(D)(2) and (4). In determining existing uses, the VWQS instruct ANR to consider:

> a. Aquatic biota and wildlife that utilize or are present in the waters;
>
> b. Habitat that supports existing aquatic biota, wildlife, or plant life;
>
> c. The use of the waters for recreation or fishing;
>
> d. The use of the water for water supply, or commercial activity that depends directly on the preservation of an existing high level of water quality; and
>
> e. . . . regarding . . . the factors considered under paragraphs (a) and (b) above, evidence of the use's ecological significance in the functioning of the ecosystem or evidence of the use's rarity.

VWQS § 1-03(B)(1).

AW/VPC argues that whitewater boating, and whitewater boating on scheduled releases, are existing uses on the Green River in the sense that they have taken place.[15] AW/VPC further contends that the state has recognized whitewater boating on the Green River as an existing use by including it in the 2016 Lamoille Basin Plan list of existing uses.

VNRC, VTTU, and ANR counter that ANR has discretion to define existing uses broadly or narrowly, and that here ANR has defined the broader use of recreational boating—and not the narrower use of whitewater boating—as an existing use. ANR contends that whitewater boating on the Green River is listed in the 2016 Lamoille Basin Plan only as an example of a type of recreational boating, not as a standalone existing use.

Whether the 2016 Lamoille Basin Plan designates whitewater boating on the Green River, and if so, to what degree, is a disputed material fact that we are not able to resolve on the record now before us. Furthermore, while existing uses may be identified in the basin planning basis,

---

[15] While not all of AW/VPC's amended questions specifically reference the Green River, its briefings appear to focus on that water body.

26

they also may be determined by ANR on a case-by-case basis "during consideration of an application." VWQS § 1-03(B)(1). The matter now before the Court is an application for a § 401 certification, and the Court is sitting in the place of ANR in considering that application. 10 V.S.A. § 8504(h). Even if the 2016 Lamoille Basin Plan does not identify whitewater boating on the Green River as an existing use, that would not be dispositive, because we would have the power to identify it as an existing use.

Because we are unable to determine at this time whether whitewater boating on the Green River (or other waters affected by the Project) is an existing use, VNRC and VTTU's motion for summary judgment on AW/VPC amended Questions 4, 5, 7, 8, 9, 11, and 12 is **DENIED**.

Because there has been no formal motion for summary judgment on AW/VPC amended Questions 6 and 10, we reserve judgment on those questions.

### ORDER

1. AW/VPC's motion for summary judgment on its amended Question 1 is **DENIED**.
2. ANR's motion to dismiss AW/VPC amended Question 1 is **DENIED**, and ANR's motion to dismiss AW/VPC amended Question 14 is **GRANTED**.
3. We are inclined to grant summary judgment to ANR on AW/VPC Question 1. Because ANR has not filed a summary judgment motion on this question, however, we may not grant it summary judgment without giving all parties notice and an opportunity to respond. V.R.C.P. 56(f)(1). **We hereby give all parties 30 days from the date of this decision to file briefs and supporting documents with the Court regarding the question of whether ANR complied with the one-year timeline in Section 401.**
4. ANR's motion for summary judgment on part of MWL Question 3 is **GRANTED**.
5. VNRC and VTTU's motion to dismiss MWL Questions 1, 2, 6, 8, and the portion of Question 3 not affected by ANR's motion for summary judgment is **GRANTED**.
6. ANR's motions to dismiss and for summary judgment on MWL Questions 1, 2, and 6 are **MOOT**.
7. ANR's motion for leave to file a sur-reply is **GRANTED**.

8.  VNRC and VTTU's motion for summary judgment on AW/VPC's amended Question 3 is **GRANTED**. VNRC and VTTU's motion for summary judgment on AW/VPC's amended Questions 4, 5, 7, 8, 9, 11, and 12 is **DENIED**.

Electronically signed on June 13, 2017 at 02:37 PM pursuant to V.R.E.F. 7(d).

_____

Thomas G. Walsh, Judge
Superior Court, Environmental Division

28